INDEX OF EXHIBITS

TO COMPLAINT FILED IN STATE COURT

Affidavit        Affidavit of Nathir Hermez.

Exhibit 1        Michigan Department of Regulatory and Licensing Affairs (LARA)

                 records regarding Richmond Mail, LLC.

Exhibit 2        LARA Annual Statements Richmond Main, LLC.

Exhibit 3        Operating and Easement Agreement between Dayton Hudson

                 Corporation and Frenchtown Square Partnership.

Exhibit 4        Covenant Deed between Target Corporation and Richmond Main,

                 LLC.

Exhibit 5        Bill of Sale between Target Corporation and Richmond Main, LLC.

Exhibit 6        Assignment and Assumption of Operation and Easement Agreement

                 between Target Corporation and Richmond Main, LLC.

Exhibit 7        Ohio Court's Judgment Entry denying Richmond Main LLC's Motion

                 to Dismiss.

Exhibit 8        Settlement Agreement.

Exhibit 9        Ohio Court's Notice of Dismissal Without Prejudice.

Exhibit 10       The Monroe News article on Target's closure.

Exhibit 11       Michigan Court search result.

Exhibit 12       Trumbull County, Ohio Court search result.

**Affidavit**

## STATE OF MICHIGAN
## MONROE COUNTY CIRCUIT COURT

RICHMOND MAIN, LLC,
a Michigan Domestic Limited Liability Company

       Plaintiff,

                                    Case No.  24-       -CB
                                    Hon.

v.

FRENCHTOWN SQUARE PARTNERSHIP,
an Ohio General Partnership registered with the
Ohio Secretary of State,

       Defendant
                              /

PHILLIP A. GREENBLATT, PLLC
Phillip A. Greenblatt (P54170)
Attorney for Plaintiff
P.O. Box 4270
Southfield, MI  48037
(248) 227-7350
phil@phillipagreenblattpllc.com
                              /

## **AFFIDAVIT**

STATE OF MICHIGAN     )
                       ) SS.
COUNTY OF MACOMB    )

      Nathir Hermez, being first duly sworn, deposes and states as follows:

      1.  Affiant states that, if sworn as a witness, Affiant can testify competently to the facts stated herein in this Affidavit and attests that the statements are true and accurate to the best of my information, knowledge, and belief.

      2.  That I am the officer and member of the captioned Plaintiff entity identified in the Plaintiff's Complaint.

3. That Affiant's statements in this Affidavit are based upon Affiant's personal knowledge of the facts and matters set forth herein and with respect to the allegations set forth in the Plaintiff's Complaint and Exhibits attached thereto as accurate and truthful.

FURTHER, AFFIANT sayeth not.

By: _____
Nathir Hermez

Subscribed and sworn to before me
This __9th__ day of __July_____, 2024.
_____
Pauline Kallo , Notary Public
Macomb County, Michigan
Acting in Macomb County, MI
My commission expires: 04 / 08 / 2028

> PAULINE KALLO
> NOTARY PUBLIC - STATE OF MICHIGAN
> COUNTY OF MACOMB
> My Commission Expires April 08, 2028
> Acting in the County of _Macomb_____

2

**Exhibit 1**

Filed by Corporations Division Administrator   Filing Number: 201905709540   Date: 11/22/2019



Form Revision Date 02/2017

# ARTICLES OF ORGANIZATION
## For use by DOMESTIC LIMITED LIABILITY COMPANY

*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned executes the following Articles:*

**Article I**

The name of the limited liability company is:

RICHMOND MAIN, LLC

**Article II**

Unless the articles of organization otherwise provide, all limited liability companies formed pursuant to 1993 PA 23 have the purpose of engaging in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan. You may provide a more specific purpose:

**Article III**

The duration of the limited liability company if other than perpetual is:

PERPETUAL

**Article IV**

The street address of the registered office of the limited liability company and the name of the resident agent at the registered office (P.O. Boxes are not acceptable):

1. Agent Name:          NATHIR HERMEZ
2. Street Address:      56684 HARTLEY DR. WEST
   Apt/Suite/Other:
   City:                SHELBY TWP.
   State:               MI                          Zip Code: 48316

3. Registered Office Mailing Address:
   P.O. Box or Street   56684 HARTLEY DR. WEST
   Address:
   Apt/Suite/Other:
   City:                SHELBY TWP.
   State:               MI                          Zip Code: 48316

Signed this 22nd Day of November, 2019 by the organizer(s):

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Nathir Hermez | Organizer | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

| Decline          | Accept

Filed by Corporations Division Administrator   Filing Number: 201905709540   Date: 11/22/2019

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

**This is to Certify that the**   ARTICLES OF ORGANIZATION

*for*

RICHMOND MAIN, LLC

**ID Number:**   802387837

**received by electronic transmission on**   November 22, 2019  *, is hereby endorsed.*

**Filed on**   November 22, 2019*, by the Administrator.*

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 22nd day of November, 2019.*

*Julia Dale, Director*
*Corporations, Securities & Commercial Licensing Bureau*

LARA Home    Contact LARA    Online Services    News    MI.gov

# LARA Corporations Online Filing System
## Department of Licensing and Regulatory Affairs

ID Number: 802387837

Request certificate    Return to Results    New search

Summary for:  RICHMOND MAIN, LLC

The name of the DOMESTIC LIMITED LIABILITY COMPANY:   RICHMOND MAIN, LLC

---

**Entity type:**  DOMESTIC LIMITED LIABILITY COMPANY

**Identification Number:** 802387837

**Date of Organization in Michigan:**  11/22/2019

**Purpose:** All Purpose Clause

**Term:**  Perpetual

**The name and address of the Resident Agent:**

| | |
|---|---|
| Resident Agent Name: | NATHIR HERMEZ |
| Street Address: | 56684 HARTLEY DR. WEST |
| Apt/Suite/Other: | |
| City: | SHELBY TWP.    State: MI    Zip Code:   48316 |

**Registered Office Mailing address:**

| | |
|---|---|
| P.O. Box or Street Address: | 56684 HARTLEY DR. WEST |
| Apt/Suite/Other: | |
| City: | SHELBY TWP.    State: MI    Zip Code:   48316 |

---

**Act Formed Under:**  023-1993 Michigan Limited Liability Company Act

**Acts Subject To:**  023-1993 Michigan Limited Liability Company Act

**Managed By:**

Members

---

**View filings for this business entity:**

ALL FILINGS
ANNUAL REPORT/ANNUAL STATEMENTS
CERTIFICATE OF CORRECTION
CERTIFICATE OF CHANGE OF REGISTERED OFFICE AND/OR RESIDENT AGENT
RESIGNATION OF RESIDENT AGENT

View filings

**Comments or notes associated with this business entity:**

LARA FOIA Process      Transparency      State Web Sites

Michigan.gov Home      ADA      Michigan News      Policies

Copyright 2024 State of Michigan

**Exhibit 2**

CSCL/CD-2700 (10/23)

15-08

## DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS
## LIMITED LIABILITY COMPANY ANNUAL STATEMENT

# 2024

**Due February 15, 2024**    File Online at www.michigan.gov/corpfileonline

| Identification Number | Limited Liability Company Name |
|---|---|
| **802387837** | **RICHMOND MAIN, LLC** |

1 Resident agent name and mailing address of the registered office

**NATHIR HERMEZ**
**56684 HARTLEY DR. WEST**
**SHELBY TWP., MI 48316**

RECEIVED

JAN 08 2024

LARA $25 00

Change resident agent and/or mailing address of registered office in MICHIGAN (can be a P.O. Box)

FILED

FEB 0 7 2024

CORPORATIONS DIVISION

2 The address of the registered office

**56684 HARTLEY DR. WEST**
**SHELBY TWP., MI 48316**

Change address of registered office in MICHIGAN (MICHIGAN address: number, street, city, state, zip, cannot be a P.O. Box)

3. Signature of authorized member, manager or agent.

X

Title: owner

Date: 12-29-2023

Phone (Optional)

## Annual Statement Must Be Signed (Item 3 above)

**Domestic:** Signature of a manager if management is vested in managers, by at least 1 member if management remains in the members, or by an authorized agent of the domestic limited liability company.

**Foreign:** Signature of a person with authority to do so under the laws of the foreign limited liability company's jurisdiction of organization

**Filing Fee: $25.00**

## Annual Statement must be received by agency on or before February 15, 2024.

**Veterans:** Pursuant to MCL 450.5101(9)(10), if a majority of the membership interests in the limited liability company responsible for paying the fee are held by 1 or more veterans who served in the United States Armed Forces, (including the reserve components) who were discharged or released under conditions other than dishonorable, you may obtain further information regarding a fee waiver at **www.michigan.gov/corpveteranfeewaivers**

**Submit**
**Online: www.michigan.gov/corpfileonline**
Save time by filing online  You will get an immediate response and you can elect to receive future notices by email to the resident agent. The agent will also be sent an email when a document is filed, or the CID/PIN is requested  You will need your Customer ID number (CID) and PIN, which can be obtained using the CID/PIN Recovery Page at **www.michigan.gov/corppin**

**Mail:** Return completed statement with a check or money order payable to the State of Michigan to:
Corporations Division, P O  Box 30768, Lansing, MI 48909. (517) 241-6470

Required by section 207, 1993 PA 23, as amended

BAT2700LLC_NOV

Filed by Corporations Division Administrator   Filing Number: 223621762700    Date: 01/06/2023



Form Revision Date 07/2016

# ANNUAL STATEMENT
## For use by DOMESTIC LIMITED LIABILITY COMPANY
### *(Required by Section 207, Act 23, Public Act of 1993)*

Identification Number:                                       802387837

Annual Statement Filing Year:    2023

1. Limited Liability Company Name:

   RICHMOND MAIN, LLC

2. The street address of the limited liability company's registered office and name of the resident agent at that office:
   1. Resident Agent Name:    NATHIR HERMEZ
   2. Street Address:        56684 HARTLEY DR. WEST
      Apt/Suite/Other:
      City:                  SHELBY TWP.
      State:                 MI                        Zip Code: 48316

3. Mailing address of the registered office:
   P.O. Box or Street        56684 HARTLEY DR. WEST
   Address:
   Apt/Suite/Other:
   City:                     SHELBY TWP.
   State:                    MI                        Zip Code: 48316

This annual statement must be signed by a member, manager, or an authorized agent.

Signed this 6th Day of January, 2023 by:

| Signature | Title | Title if "Other" was selected |
|-----------|-------|-------------------------------|
| Nathir Hermez | Member | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

¦ Decline      ¦ Accept

Filed by Corporations Division Administrator   Filing Number: 223621762700   Date: 01/06/2023

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

**This is to Certify that the** 2023 ANNUAL STATEMENT

*for*

RICHMOND MAIN, LLC

**ID Number:**   802387837

**received by electronic transmission on**   January 06, 2023   *, is hereby endorsed.*

**Filed on**   January 06, 2023   *, by the Administrator.*

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 6th day of January, 2023.*

Linda Clegg

*Linda Clegg, Director*
*Corporations, Securities & Commercial Licensing Bureau*

Filed by Corporations Division Administrator  Filing Number: 223621760300  Date: 01/06/2023



Form Revision Date 07/2016

# ANNUAL STATEMENT
## For use by DOMESTIC LIMITED LIABILITY COMPANY
### (Required by Section 207, Act 23, Public Act of 1993)

Identification Number:                                      802387837

Annual Statement Filing Year:   2022

1. Limited Liability Company Name:

   RICHMOND MAIN, LLC

2. The street address of the limited liability company's registered office and name of the resident agent at that office:
1. Resident Agent Name:          NATHIR HERMEZ
2. Street Address:                56684 HARTLEY DR. WEST
   Apt/Suite/Other:
   City:                          SHELBY TWP.
   State:                         MI                          Zip Code: 48316

3. Mailing address of the registered office:
   P.O. Box or Street             56684 HARTLEY DR. WEST
   Address:
   Apt/Suite/Other:
   City:                          SHELBY TWP.
   State:                         MI                          Zip Code: 48316

This annual statement must be signed by a member, manager, or an authorized agent.

Signed this 6th Day of January, 2023 by:

| Signature | Title | Title if "Other" was selected |
|---|---|---|
| Nathir Hermez | Member | |

By selecting ACCEPT, I hereby acknowledge that this electronic document is being signed in accordance with the Act. I further certify that to the best of my knowledge the information provided is true, accurate, and in compliance with the Act.

¦ Decline        ¦ Accept

Filed by Corporations Division Administrator   Filing Number: 223621760300      Date: 01/06/2023

# MICHIGAN DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS

## FILING ENDORSEMENT

**This is to Certify that the** 2022  ANNUAL STATEMENT

*for*

RICHMOND MAIN, LLC

**ID Number:**    802387837

**received by electronic transmission on**    January 06, 2023     **, is hereby endorsed.**

**Filed on**    January 06, 2023    **, by the Administrator.**

*The document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.*



*In testimony whereof, I have hereunto set my hand and affixed the Seal of the Department, in the City of Lansing, this 6th day of January, 2023.*

*Linda Clegg, Director*
*Corporations, Securities & Commercial Licensing Bureau*

CSCL/CD-2700 (10/20)

15-08

**DEPARTMENT OF LICENSING AND REGULATORY AFFAIRS**
**LIMITED LIABILITY COMPANY ANNUAL STATEMENT**

# 2021

**Due February 15, 2021**                    File Online at www.michigan.gov/corpfileonline

| Identification Number | Limited Liability Company Name |
|---|---|
| **802387837** | **RICHMOND MAIN, LLC** |

**1** Resident agent name and mailing address of the registered office

NATHIR HERMEZ
56684 HARTLEY DR. WEST
SHELBY TWP., MI 48316

Change resident agent and/or mailing address of registered office in MICHIGAN (can be a P.O. Box).

RECEIVED            FILED

DEC 28 2020 $25.00        MAR 05 2021

CORPORATIONS DIVISION

LARA

**2** The address of the registered office

56684 HARTLEY DR. WEST
SHELBY TWP., MI 48316

Change address of registered office in MICHIGAN (MICHIGAN address: number, street, city, state, zip, cannot be a P.O. Box).

| 3. Signature of authorized member, manager or agent. | Title | Date | Phone (Optional) |
|---|---|---|---|
| X _(signature)_ | OWNER | 12/18/20 | |

## Annual Statement Must Be Signed (Item 3 above)

**Domestic:** Signature of a manager if management is vested in managers, by at least 1 member if management remains in the members, or by an authorized agent of the domestic limited liability company.

**Foreign:** Signature of a person with authority to do so under the laws of the foreign limited liability company's jurisdiction of organization.

**Filing Fee: $25.00**

## Annual Statement must be received by agency on or before February 15, 2021.

**Veterans:** Pursuant to MCL 450.5101(9)(10), if a majority of the membership interests in the limited liability company responsible for paying the fee are held by 1 or more veterans who served in the United States Armed Forces, (including the reserve components) who were discharged or released under conditions other than dishonorable, you may obtain further information regarding a fee waiver at **www.michigan.gov/corpveteranfeewaivers**

**Submit**
**Online: www.michigan.gov/corpfileonline**
Save time by filing online  You will get an immediate response and you can elect to receive future notices by email to the resident agent. The agent will also be sent an email when a document is filed, or the CID/PIN is requested  You will need your Customer ID number (CID) and PIN, which can be obtained using the CID/PIN Recovery Page at **www.michigan.gov/corppin**.

**Mail:** Return completed statement with a check or money order payable to the State of Michigan to.
Corporations Division, P.O. Box 30768, Lansing, MI 48909  (517) 241-6470

Required by section 207, 1993 PA 23, as amended

BAT2700LLC_NOV

**Exhibit 3**

T-900 Monroe
(d-file)



RECEIVED FOR RECORD

94 AUG -4 PM 12: 12

*Geri Allen*
REGISTER OF DEEDS
MONROE COUNTY, MICH

LIBER 1396 PAGE 0958

# OPERATION AND EASEMENT AGREEMENT

## BETWEEN

## DAYTON HUDSON CORPORATION

### AND

## FRENCHTOWN SQUARE PARTNERSHIP

#7408

14
OEA
#4673 EJ
175.00

LIBER 1396 PAGE 0959

OPERATION AND EASEMENT AGREEMENT

TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| | PARTIES . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| ARTICLE I | DEFINITIONS . . . . . . . . . . . . . . . . . . | 2 |
| 1.1 | Building Area . . . . . . . . . . . . . . . . | 2 |
| 1.2 | Common Area . . . . . . . . . . . . . . . . . | 2 |
| 1.3 | Floor Area . . . . . . . . . . . . . . . . . | 2 |
| 1.3A | Major Store Buildings . . . . . . . . . . . . | 3 |
| 1.3B | Mall Store Buildings . . . . . . . . . . . . . | 3 |
| 1.4 | Occupant . . . . . . . . . . . . . . . . . . | 3 |
| 1.5 | Party . . . . . . . . . . . . . . . . . . . . | 4 |
| 1.5A | Permissible Building Area(s) . . . . . . . . . | 4 |
| 1.6 | Person . . . . . . . . . . . . . . . . . . . | 5 |
| 1.7 | Permittee . . . . . . . . . . . . . . . . . . | 5 |
| 1.8 | Shopping Center . . . . . . . . . . . . . . . | 5 |
| 1.9 | Tract/Parcel . . . . . . . . . . . . . . . . | 5 |
| ARTICLE II | EASEMENTS . . . . . . . . . . . . . . . . . . | 5 |
| 2.1 | Ingress and Egress . . . . . . . . . . . . . . | 5 |
| 2.2 | Utilities . . . . . . . . . . . . . . . . . . | 8 |
| 2.3 | Construction, Maintenance and Reconstruction . . . | 10 |
| 2.4 | Restriction . . . . . . . . . . . . . . . . . | 11 |
| ARTICLE III | CONSTRUCTION . . . . . . . . . . . . . . . . | 11 |
| 3.1 | General Requirements . . . . . . . . . . . . . | 11 |
| 3.2 | Common Area . . . . . . . . . . . . . . . . . | 14 |
| 3.3 | Building Improvement . . . . . . . . . . . . . | 16 |
| ARTICLE IV | MAINTENANCE AND REPAIR . . . . . . . . . . . | 20 |
| 4.1 | Utilities . . . . . . . . . . . . . . . . . . | 20 |
| 4.2 | Common Area . . . . . . . . . . . . . . . . . | 20 |
| 4.3 | Building Improvements . . . . . . . . . . . . | 25 |

LIBER 1396 PAGE 0960

ARTICLE V    OPERATION OF THE SHOPPING CENTER . . . . . . . . .   26
  5.1        Operating Covenants/Uses . . . . . . . . . .   26
  5.2        Lighting . . . . . . . . . . . . . . . . . .   31
  5.3        Signs . . . . . . . . . . . . . . . . . . . .   33
  5.4        Insurance . . . . . . . . . . . . . . . . . .   34
  5.5        Taxes and Assessments . . . . . . . . . . . .   39
  5.6        Liens. . . . . . . . . . . . . . . . . . . . .   39


ARTICLE VI   MISCELLANEOUS . . . . . . . . . . . . . . . .   40
  6.1        Default . . . . . . . . . . . . . . . . . . .   40
  6.2        Interest . . . . . . . . . . . . . . . . . .   41
  6.3        Estoppel Certificate . . . . . . . . . . . .   42
  6.4        Notices . . . . . . . . . . . . . . . . . . .   43
  6.5        Approval Rights . . . . . . . . . . . . . . .   43
  6.6        Condemnation . . . . . . . . . . . . . . . .   44
  6.7        Binding Effect. . . . . . . . . . . . . . . .   44
  6.8        Singular and Plural . . . . . . . . . . . . .   45
  6.9        Counterparts and Signature Pages . . . . . .   45
  6.10       Negation of Partnership . . . . . . . . . . .   45
  6.11       Not a Public Dedication . . . . . . . . . . .   45
  6.12       Excusable Delays . . . . . . . . . . . . . .   45
  6.13       Severability . . . . . . . . . . . . . . . .   46
  6.14       Amendments . . . . . . . . . . . . . . . . .   46
  6.15       Captions and Capitalized Terms . . . . . . .   46
  6.16       Minimization of Damages . . . . . . . . . . .   46
  6.17       OEA Shall Continue Notwithstanding Breach . .   46
  6.18       Time . . . . . . . . . . . . . . . . . . . .   47
  6.19       Non-Waiver . . . . . . . . . . . . . . . . .   47
  6.20       Liability . . . . . . . . . . . . . . . . . .   47


ARTICLE VII  TERM . . . . . . . . . . . . . . . . . . . .   47
  7.1        Term of this OEA . . . . . . . . . . . . . .   47


EXHIBIT A    Legal Description of Target Tract
EXHIBIT B    Legal Description of Developer Tract
EXHIBIT C    (There is No Exhibit C)
EXHIBIT D    Pylon Sign
EXHIBIT E    Legal Description of Access Road Easement (One)
EXHIBIT E-1  Legal Description of Access Road Easement (Two)
EXHIBIT F    Utility Plans List
EXHIBIT G    Fire Clauses of Majors
EXHIBIT H    Sign Criteria

EXHIBIT X    Site Plan
EXHIBIT X-1  Drawing

-ii-

LIBER 1396 PAGE 0961

## OPERATION AND EASEMENT AGREEMENT

THIS AGREEMENT ("OEA") is made and entered into as of the _3rd_ day of _August_, 19 _94_ between DAYTON HUDSON CORPORATION, a Minnesota corporation ("Target") and FRENCHTOWN SQUARE PARTNERSHIP, an Ohio general partnership ("Developer").

### WITNESSETH:

WHEREAS, Target is the owner of a certain tract of land described in Exhibit A attached hereto ("Target Tract") and identified as such on Exhibit X (the "Site Plan") attached hereto; and

WHEREAS, Developer is the owner of a certain tract of land described in Exhibit B attached hereto ("Developer Tract") and identified as such on the Site Plan; and

WHEREAS, the Target Tract and the Developer Tract are contiguous and adjacent as shown on the Site Plan and collectively are the "Shopping Center"; and

WHEREAS, Developer has heretofore developed the Developer Tract as a shopping complex; and

WHEREAS, the signatories hereto intend to operate their respective Tracts in conjunction with each other as integral parts of a retail shopping complex and in order to effectuate the common use and operation thereof they desire to enter into certain covenants and agreements as a part of a general plan, and to grant to each other certain reciprocal easements, in, to, over and across their respective Tracts.

NOW, THEREFORE, in consideration of the premises, the covenants and agreements hereinafter set forth and in furtherance of the Parties' understanding, it is agreed as follows:

LIBER 1396 PAGE 0962

## ARTICLE I
## DEFINITIONS

1.1  <u>Building Area</u>.  "Building Area" shall mean the limited areas of the Shopping Center within which buildings (including canopies, supports, loading docks, truck ramps and other outward extensions) may be constructed, placed or located.

1.2  <u>Common Area</u>.  "Common Area" shall mean all areas within the exterior boundaries of the Shopping Center, exclusive of buildings and their respective truck docks and/or receiving areas.

1.3  <u>Floor Area</u>.  "Floor Area" shall mean the total, from time to time, of the actual number of square feet of enclosed floor space in any building and any enclosed, permanently heated and/or air-conditioned Outdoor Selling Areas located on a Party's Parcel, as exclusively appropriated for use by an Occupant of such Parcel and not part of Common Areas, whether or not actually occupied.  Floor Area includes:  (i) basement space; (ii) balcony and mezzanine space; (iii) space occupied by columns, stairs, escalators, dumbwaiters, conveyors or other interior equipment within the building involved (except as excluded below); and (iv) space occupied by any Kiosk. (A Kiosk shall be measured from its outermost projection.)  Notwith-standing the foregoing provisions of this definition, Floor Area shall not include space for:  (1) balcony and mezzanine space used for stock area and the second or more levels of any multi-deck stock areas unless the area exceeds three and one-half percent (3-1/2%) of a building, in which case the excess will be included within Floor Area;  (2) metal or wood open-grate two-level shelving used for storage of merchandise;  (3) the Shopping Center's management and security offices and Merchants' Association or Marketing Fund office; (4) community hall and meeting rooms, if any [but in no event shall there be excluded from "Floor Area" pursuant to this item (4) more than 5,000 square feet of floor space];  (5) Common Area maintenance office and equipment storage areas used exclusively for the storage of maintenance and promotional equipment, supplies and materials for Common Area maintenance and Shopping Center promotions;  (6) emergency

-2-

LIBER 1396 PAGE 0963

exit corridors between fire resistant walls required by building
codes and not contained within any area exclusively appropriated for
the use of any single Occupant; (7) any Enclosed Mall public
restroom; and (8) Outdoor Selling Areas if not enclosed or not
permanently heated and/or air-conditioned. Floor Area shall be
measured from the exterior faces of the exterior walls (including
basement walls), except that where party and interior common walls
are involved, Floor Area shall be measured from the center thereof
instead of from the exterior faces thereof, irrespective of openings,
if any, for entranceways contained therein.

During any period of rebuilding, repairing, replacement or
reconstruction of a building, the Floor Areas of that building shall
be deemed to be the same as existed immediately prior to that period.
Upon completion of such rebuilding, repairing, replacement or
reconstruction, the Party upon whose Tract such building is located,
shall cause a new determination of Floor Area for such building to be
made in the manner described above, and such determination shall be
sent to any Party requesting the same.

1.3A  Major Store Buildings.  "Major Store Buildings" shall
mean the buildings designated Unit 100, Unit 200, Unit 300, Unit 395,
and Unit 650 on Exhibit X (together with any additions thereto or
replacements thereof) which shall abut, with openings, on the
enclosed mall.

1.3B  Mall Store Buildings.  "Mall Store Buildings" shall mean
the buildings designated as such on Exhibit X (together with any
additions thereto or replacements thereof) within the Permissible
Building Areas of the Shopping Center, excluding the Major Store
Buildings, which shall abut, with openings, on the enclosed mall.

1.4  Occupant.  "Occupant" shall mean any Person from time to
time entitled to the use and occupancy of any portion of a building
or land in the Shopping Center under any lease, sublease, license,
concession, or other similar agreement, or who owns land which is
included within the Shopping Center.

-3-

LIBER 1396 PAGE 0964

1.5   Party.   "Parties" shall be the signatory hereto and, after compliance with the notice requirements set forth below, their respective successors and assigns who shall become owners of the total Tract of either Developer or Target.   Until the notice requirement is complied with, the transferring Party shall (for the purpose of this OEA only) be the transferee's agent.   Each Party shall be liable for the performance of all covenants, obligations and undertakings herein set forth with respect to the portion of the Shopping Center owned by it which accrue during the period of such ownership, and such liability shall continue with respect to any portion transferred until the notice requirement set forth below is complied with, at which time the transferring Party's personal liability shall terminate.   The transferee Party shall automatically become liable for all obligations arising after compliance with the notice requirement.   A Party transferring all of its interest in the Shopping Center shall give notice to all other Parties of such transfer and shall include therein at least the following information:

(a)   the name and address of the transferee; and

(b)   A copy of the survey or Site Plan with metes and bounds description showing the location and indicating the legal description of the portion of the Shopping Center transferred.

Nothing contained herein to the contrary shall affect the existence, priority, validity or enforceability of any lien permitted hereunder which is placed upon the transferred portion of the Shopping Center prior to receipt of the notice.

1.5A   Permissible Building Area(s).   "Permissible Building Area(s)" shall mean the area(s) designated as such on Exhibit X within which buildings and other improvements are permitted to be constructed pursuant to the terms of this OEA.   Permissible Building Area not developed with buildings shall be developed as Common Area until such time as a building is constructed thereon.

-4-

LIBER 1396 PAGE 0965

1.6 <u>Person</u>. "Person" shall mean any individual, partnership, firm, association, corporation, trust, or any other form of business or government entity.

1.7 <u>Permittee</u>. "Permittees" shall mean all Occupants and the officers, directors, employees, agents, contractors, customers, vendors, suppliers, visitors, invitees, licensees, subtenants, and concessionaires of Occupants insofar as their activities relate to the intended use of the Shopping Center. Among others, Persons engaging in the following activities on the Common Area will not be considered to be Permittees:

(i) Exhibiting any placard, sign or notice;

(ii) Distributing any circular, handbill, placard or booklet;

(iii) Soliciting memberships or contributions;

(iv) Parading, picketing, or demonstrating; and

(v) Failing to follow regulations relating to the use of the Shopping Center.

1.8 <u>Shopping Center</u>. "Shopping Center" shall mean the Developer Tract and the Target Tract identified on Exhibit X attached hereto.

1.9 <u>Tract/Parcel</u>. "Tract" or "Parcel" shall mean that portion of the Shopping Center owned by a Party.

ARTICLE II
EASEMENTS

2.1 <u>Ingress and Egress</u>.

(A) <u>Perpetual Ingress and Egress</u>.

(i) Target hereby grants to Developer, its successors and assigns, a perpetual, non-exclusive easement over the area crosshatched in green on Exhibit X and described in Exhibit E attached hereto, for ingress and egress in common with others entitled to use the same, for the passage of vehicles over and across the driveway areas described on the

-5-

LIBER 1396 PAGE 0966

Target Tract.  Target agrees that all of this area shall always be used solely for ingress and egress, as shown on Exhibit X.

(ii)  Developer hereby grants to Target, its successors and assigns, a perpetual, non-exclusive easement over the area shaded in yellow on Exhibit X and described in Exhibit E-1 attached hereto, for ingress and egress in common with others entitled to use the same, for the passage of vehicles over and across the driveway areas described on the Developer Tract.  Developer agrees that all of this area shall always be used solely for ingress and egress, as shown on Exhibit X.

(B)  During the term of this OEA each Party hereby grants and conveys to each other Party for its use and for the use of its Permittees, in common with others entitled to use the same, a non-exclusive easement for the passage and parking of vehicles over and across the parking and driveway areas of the grantor's Tract as the same may from time to time be constructed and maintained for such use and for the passage and accommodation of pedestrians over and across the parking, driveways and sidewalk areas of the grantor's Tract as the same may from time to time be constructed and maintained for such use.  Such easement rights shall be subject to the following reservations as well as other provisions contained in this OEA:

(i)  Except for situations specifically provided for in the following subparagraphs, no fence or other barrier which would unreasonably prevent or obstruct the passage of pedestrian or vehicular travel for the purposes herein permitted shall be erected or permitted within or across the easement areas; provided, however, that the foregoing provision shall not prohibit the installation of convenience facilities (such as mailboxes, public telephones, benches or public transportation shelters), of landscaping, berms or planters, nor of limited curbing and other forms of traffic controls.

-6-

LIBER 1396 PAGE 0967

(ii)  In   connection   with   any   construction, reconstruction, repair or maintenance on its Tract, each Party reserves the right to create a staging and/or storage area in the Common Area on its Tract at such location as will not unreasonably interfere with access between such Tract and the other areas of the Shopping Center.

(iii) Each Party hereby reserves the right, from time to time without obtaining the consent or approval of any other Party, to make at its own expense any insignificant change, modification or alteration in its portion of the Common Area, provided that:

(a)   The accessibility of such Common Area for pedestrian and vehicular traffic (as it relates to the   remainder   of   the   Shopping   Center)   is   not unreasonably restricted or hindered.

(b)   there shall be maintained at all times within such Common Area, a sufficient number of vehicular   parking   spaces   to   meet   the   parking requirements set forth in 3.2 (E), and all parking stalls and rows and vehicular traffic lanes shall remain generally as shown on the Site Plan;

(c)   no governmental rule, ordinance or regulation shall be violated as a result of such action, and such action shall not result in any other Party being in violation of any governmental rule, ordinance or regulation;

(d)   no change shall be made in the access points between the Common Area and the public streets; except that additional access points may be created without the approval of either Party provided such additional access point(s) (i) have no adverse effect on the other Party's Tract, (ii) are not within two hundred (200) feet of an existing point, and (iii) are more than

-7-

LIBER 1396 PAGE 0968

two hundred (200) feet from the common boundary of the
Developer and Target Tracts;

(e)   at least thirty (30) days prior to
making any such change, modification or alteration, the
Party desiring to do such work shall deliver to each
other Party copies of the plans therefor, and provided
further that such work shall not occur between October
1st and the following January 31st.

(iv)   Except for the areas described in Section
2.1 (A) above, each Party reserves the right to close off its
portion of the Common Area for such reasonable period of time
as may be legally necessary, in the reasonable opinion of such
Party's counsel, to prevent the acquisition of prescriptive
rights by anyone; provided, however, that prior to closing off
any portion of the Common Area, as herein provided, such Party
shall give not less than thirty (30) days' written notice to
each other Party of its intention to do so, and shall attempt
to coordinate such closing with each other Party so that no
unreasonable interference in the passage of pedestrians or
vehicles shall occur;

(v)   Each Party reserves the right at any time
and from time to time to exclude and restrain any Person who
is not a Permittee from using its Common Area.

2.2   Utilities.

(A)   Each Party hereby grants and conveys to each other
Party non-exclusive perpetual easements in, to, over, under, along
and across those portions of the Common Area (exclusive of any
portion located within a Building Area) located on the grantor's
Tract necessary for the installation, operation, flow, passage, use,
maintenance, connection, repair, relocation, and removal of lines or
systems for utilities serving the grantee's Tract, including but not
limited to, sanitary sewers, storm drains, water (fire and domestic),
gas, electrical, telephone and communication lines. Except with

-8-

LIBER 1396 PAGE 0969

respect to ground mounted electrical transformers at the rear of a
building or as may be necessary during periods of construction,
repair, or temporary service, all utilities shall be underground
unless required to be above ground by the utility providing such
service. Prior to exercising the right granted herein, the grantee
shall first provide the grantor with a written statement describing
the need for such easement, shall identify the proposed location of
the utility, and shall furnish a certificate of insurance showing
that its contractor has obtained the minimum insurance coverage
required by 5.4 (D) hereof. Any Party installing utilities pursuant
to the provisions of this subparagraph shall pay all costs and
expenses with respect thereto and shall cause all work in connection
therewith (including general clean-up and proper surface and/or
subsurface restoration) to be completed as quickly as possible and in
a manner so as to minimize interference with the use of the Common
Area by the Parties hereto. If any of the Parties elects to install
common utilities, all costs and expenses thereof may be set forth in
a separate agreement between those cooperating Parties.

(B) Attached hereto as Exhibit F is a list of the
as-built plans showing the location of all utilities in the Shopping
Center. The grantor shall have the right at any time to relocate a
utility line upon thirty (30) days' prior written notice, provided
that such relocation:

(i) shall not interfere with or diminish the
utility services to the grantee;

(ii) shall not reduce or unreasonably impair the
usefulness or function of such utility;

(iii) shall be performed without cost or expense
to grantee and without unreasonably interfering with the use
of the Common Areas by the other Party or its Permittees;

(iv) shall be completed using materials and
design standards which equal or exceed those originally used;
and

-9-

LIBER 1396 PAGE 0970

(v)     shall have been approved by the utility
company and the appropriate governmental or quasi-governmental
agencies having jurisdiction thereof.
Documentation of the relocated easement area shall be the grantor's
expense and shall be accomplished as soon as possible.  Grantee shall
have a right to require an as-built survey of such relocated utility
be delivered to it at grantor's expense.   The grantor of each
easement for utility purposes under this 2.2 reserves for itself and
its successors and assigns, the right to use the surface of the
ground over and/or under any easement granted for purposes of
landscaping and other planting, paving and parking, and any other
improvements other than structures.

2.3   Construction, Maintenance and Reconstruction.

(A)   In order to accommodate any footings, foundations,
columns or walls which may be constructed or reconstructed
immediately adjacent to a common boundary line and which may overlap
that common boundary line, each Party grants to each other Party a
non-exclusive easement in, to, over, under, and across that portion
of its Tract adjacent to such common boundary line in space not
theretofore occupied by any then existing structure for the
construction, maintenance and replacement of footings to a maximum
distance of five feet (5') onto the grantor's Tract and for the
construction, replacement and maintenance of foundations, columns, or
walls to a maximum distance of six inches (6") onto the grantor's
Tract.  The grant of easement shall include the reasonable right of
access necessary to exercise and enjoy such grant.   The easement
shall continue in effect for the term of this OEA and thereafter so
long as the building utilizing the easement area exists, including a
reasonable period to permit reconstruction or replacement of such
building if the same shall be destroyed, damaged or demolished.  If
any subterranean construction is required to be performed, and it is
necessary to remove the concrete slab above, the slab shall be
replaced and the finish material on the slab shall be repaired to its
original condition.

-10-

LIBER 1396 PAGE 0971

(B)   Prior to utilizing the easement right set forth in (A) above, the grantee Party shall advise the grantor Party of its intention to use the same, shall provide plans and specifications and proposed construction techniques for the improvements to be located within the easement area, and shall give the grantor Party an opportunity to commence any construction activities which such Party contemplates undertaking at approximately the same time to the end that each Party involved shall be able to utilize subterranean construction techniques which will permit the placement above ground of a building on each Tract immediately adjacent to the common boundary line.  If a common subterranean construction element is used by the Parties, it is specifically understood that each shall assume and pay its reasonable share of the cost and expense of the initial construction and, so long as both Parties are benefitting therefrom, subsequent maintenance thereof.  In the event any building utilizing a common subterranean element is destroyed and not replaced or is removed, the common subterranean construction element shall be left in place for the benefit of any building utilizing the same located on the adjoining Tract.

2.4   <u>Restriction</u>.  No Party shall grant any easement for the purpose set forth in this Article for the benefit of any property not within the Shopping Center; provided, however, that the foregoing shall not prohibit the granting or dedicating of utility easements or roadways by a Party on its Tract to governmental or quasi-governmental authorities or to public utilities.

ARTICLE III
CONSTRUCTION

3.1   <u>General Requirements</u>.

(A)   Each Party agrees that all construction activities performed hereafter by it within the Shopping Center shall be performed in compliance with all laws, rules, regulations, orders and ordinances of the city, county, state, and federal governments, or

-11-

LIBER **1396** PAGE **0972**

any department or agency thereof, affecting improvements constructed within the Shopping Center.

(B) Each Party further agrees that its future construction activities shall not:

(i) cause any unreasonable increase is the cost of constructing improvements upon another Party's Tract;

(ii) unreasonably interfere with construction work being performed on any other part of the Shopping Center;

(iii) unreasonably interfere with the use, occupancy or enjoyment of any part of the remainder of the Shopping Center by any other Party or its Permittees;

(iv) cause any other Party to be in violation of any law, rule, regulation, order or ordinance applicable to its Tract of the city, county, state, federal government, or any department or agency thereof.

(C) Each Party agrees to defend, indemnify and hold harmless each other Party from all claims, actions, proceedings and costs incurred in connection therewith (including reasonable attorneys' fees and costs of suit) resulting from any accident, injury or loss or damage whatsoever occurring to any Person or to the property of any Person arising out of or resulting from the performance of any construction activities performed or authorized by such indemnifying Party.

(D) Prior to constructing, reconstructing, repairing, maintaining, remodeling, or enlarging a building or maintaining or changing the Common Area on its Tract, a Party shall designate a staging and storage area on the Common Area on its Tract and shall give each other Party notice of such location at least ten (10) days prior to commencing such work. All storage of materials and the parking of construction vehicles, including vehicles of workers, shall occur only on the constructing Party's Tract. If substantial work is to be performed, the constructing Party shall, at the request of any other Party, fence off the staging and storage area. Upon

-12-

{IBER 1396 PAGE 0973

completion of such work, the constructing Party shall restore the affected Common Area to a condition at least equal to that existing prior to commencement of such work.

(E)   Each Party hereby grants and conveys to each other Party and to its respective contractors, materialmen and laborers a temporary license to enter upon the Common Area of the grantor's Tract as shall be reasonably necessary for the grantee to construct and/or maintain improvements upon the grantee's Tract; provided, however, that such license shall be in effect only during periods when actual construction and/or maintenance is being performed and provided further that the use of such license shall not be exercised so as to unreasonably interfere with the use and operation of the Common Area by others.   Prior to exercising the rights granted herein, the grantee shall first provide the grantor with a written statement describing the need for such license, and shall furnish a certificate of insurance showing that its contractor has obtained the minimum insurance coverage required by Section 5.4 (D) hereof.   Any Party availing itself of the temporary license shall promptly pay all costs and expenses associated with such work, shall diligently complete such work as quickly as possible, and shall promptly clean the area and restore the affected portion of the Common Area to a condition which is equal to or better than the condition which existed prior to the commencement of such work.   Notwithstanding the foregoing, in the event a dispute exists between the contractors, laborers and/or others connected with construction activities, each Party shall have the right to prohibit the contractors, laborers and/or others working for another Party from using the Common Area on its Tract.

(F)   Target and Developer acknowledge that the construction work heretofore in place and completed by Developer and Target may not in every instance meet the requirements of this OEA. Target and Developer hereby acknowledge and accept all construction work heretofore completed by Developer and Target and acknowledge the same is acceptable to Developer and Target.

-13-

LIBER **1396** PAGE **0974**

3.2   Common Area.  Upon its election to construct a building upon its Tract, each Party shall cause the Common Area on its Tract to be improved substantially as shown on the Site Plan with substantial completion of such Common Area to be no later than the date of mutual execution of this OEA.  Such work shall be done in a good and workmanlike manner and in accordance with good engineering standards; provided, however, the following minimum general design standards shall be complied with:

(A)   The lighting system shall be designed to produce a minimum maintained lighting intensity measured at grade at all points in the Common Area of 1.00 foot candle; provided, however, that the extreme edge of the parking or drive areas may have not less than a minimum maintained lighting intensity measured at grade of 0.5 foot candle, and provided further that the drive areas immediately in front of the pedestrian entrance to the Target building shall have not less than a minimum maintained lighting intensity measured at grade of 5.0 foot candles.  Each Party will control the light standards located on its land.  The type and design of the light standard are approved by Target and Developer.

(B)   The slope in the parking area shall not exceed a maximum of four percent (4%), nor be less than a minimum of one percent (1%), unless otherwise agreed to by the Parties.

(C)   All sidewalks shall be concrete or other material approved by the Parties.  The paved portions of the Common Area shall be paved in accordance with a paving recommendation obtained from a reputable engineering firm approved by the Parties.  Target agrees not to unreasonably withhold or delay its approval of a reputable engineering firm.  In the event Target does not respond after a request by Developer for an approval within a ten (10) day period, Target will be deemed to have approved such engineering firm.

-14-

LIBER 1396 PAGE 0975

(D)   Utilities that are placed underground shall be at
depths of not less than that designated by consultants
approved by the Parties.  Target agrees not to unreasonably
withhold or delay its approval of a consultant.  In the event
Target does not respond after a request by Developer for an
approval within a ten (10) day period, Target will be deemed
to have approved such consultant. Design and working drawings
may be prepared by the utility company providing the service.

(E)   Subject to Section 6.6 hereof, each of the Parties
to this OEA shall maintain on its Parcel(s) at all times a
parking ratio of not less than five (5) car spaces for each
one thousand (1,000) square feet of Floor Area on its Parcel.

Each parking space, as well as the bays and lanes,
shall comply with and shall have the minimum dimensions
specified on the Site Plan.  It is agreed by the Parties
hereto that the parking areas as shown on the Site Plan shall
contain not more than ten percent (10%) of the bays to
accommodate "compact" type cars, located as designated on the
Site Plan.

(F)   Developer and Target have approved the grading and
drainage plan used in initial construction of the Common Area.
During the term of this OEA, no Party shall alter the grade
elevations on any portion of its Tract from those established
by such plans if such alteration would increase the flow of
surface water onto another Party's Tract, affect ingress and
egress, or otherwise materially affect another Party's Tract
in an adverse manner.

(G)   Target and Developer acknowledge that the
construction work heretofore in place and completed by
Developer and Target may not in every instance meet the
requirements of this OEA.  Target and Developer hereby
acknowledge and accept all construction work heretofore
completed by Developer and Target and acknowledge the same is
acceptable to Developer and Target.

-15-

LIBER 1396 PAGE 0976

3.3   Building Improvement.

(A)   The Parties hereby agree that all buildings may be located only within the Building Areas designated on the Site Plan. Each Party shall cause the Buildings on its Tract to comply with all applicable requirements of the UBC, the City, or the County in which the Shopping Center is located in effect as of the effective date of this Operating Agreement.

(B)   Additions to Improvements :

(i)   Additions to Improvements Constructed on Developer Parcel:

(a)   Developer agrees that at all times during the term of this OEA, any additional improvements constructed on the Developer Parcel will conform to the following limitations:

(1)   Said improvements shall comply in height with Section 3.3 (G) of this OEA and any improvements on the Developer Parcel shall be located only within those areas designated as Permissible Building Areas on Exhibit X.

(2)   The Developer Parcel shall at all times comply with the parking requirements set forth in Section 3.2 (E) of this OEA.

(3)   Any enlargement or expansion on the Developer Parcel shall be conducted in accordance with Article 3 hereof as if such construction were initial construction, and shall be located within the Permissible Building Areas.

(4)   Notwithstanding the foregoing, Developer shall have the right from time to time and at any time to make changes in the interior, or in the arrangement of space in the Mall Store Buildings, or in the design of storefronts opening onto the enclosed mall.   Developer shall not have the right, however, to

-16-

LIBER **1396** PAGE **0977**

change the configuration, or to reduce the width of the enclosed mall except for minimal and insubstantial changes.

(5)   The Developer Design Plans shall provide for a first-class quality structure of first-class workmanship and materials and shall conform to the design, aesthetic treatment, decor and construction standards presently existing at the Shopping Center.

(6)   Target shall have the right to approve the design of any additions or modifications of the first seventy feet (70') of the common mall area, measured from Target's entrance to the enclosed mall, such approval not to be unreasonably withheld or delayed.

(ii)   <u>Additional Construction on the Target Parcel</u>:

(a)   Target agrees that at all times during the term of this OEA, any additional improvements constructed on the Target Parcel will conform to the following limitations:

(1)   Said improvements shall comply in height with Section 3.3 (G) of this OEA and any improvements on the Target Parcel shall be located only within those areas designated as Permissible Building Areas on Exhibit X.

(2)   The Target Parcel shall at all times comply with the parking requirements set forth in Section 3.2 (E) of this OEA.

(3)   Any enlargement or expansion on the Target Parcel shall be conducted in accordance with Article 3 hereof as if such construction were initial construction, and shall be located within the Permissible Building Areas.

-17-

LIBER 1396 PAGE 0978

(4)   Target's Design Plans shall provide for a first-class quality structure of first-class workmanship and materials and shall conform to the design, aesthetic treatment, decor and construction standards presently existing at the Shopping Center.

(C)   The Parties hereby specifically consent to the placement of buildings along the common boundary line between the Target Tract and the Developer Tract.

(D)   Developer acknowledges that Target has constructed on the Target Tract a "Target retail store" which is generally classified under applicable building code regulation as an "unlimited area" building. (By way of explanation, but not limitation, such building classification is designated II-N under the Uniform Building Code.) Provided Target constructs a building of such classification, or so long as a building of such classification exists on the Target Tract (including any restoration or reconstruction thereof), Developer agrees that any building to be placed or constructed on the Developer Tract that is (i) located within sixty feet (60') of the Building Area on the Target Tract, or (ii) located within sixty feet (60') of any building referenced in (i) above, shall comply with the requirements of said classification, including the installation of an approved sprinkler system for fire protection. In order to confirm the existence of a sixty foot (60') yard or clear area around the Target building and the buildings, if any, which are included within (i) and (ii) above, it may be necessary to place of record an instrument establishing the same. Each Party agrees to join in the execution of such instrument in a form satisfactory to such Parties. In addition to the requirements set forth above, no building located on the Developer Tract shall be placed or constructed in a manner which will itself preclude the construction of a building of such classification on the Target Tract.

(E)   The second Party to construct a building along the common boundary line between the Target Tract and the Developer Tract

-18-

LIBER 1396 PAGE 0979

shall do so in a manner that does not result in damage to the improvements in place on the adjoining Tract, and further shall undertake and assume at its sole cost the obligation of completing and maintaining the nominal attachment (flashing and seal) of its building to that of the existing building on the other Tract, it being the intent of the Parties to establish and maintain the appearance of one continuous building complex. In performing such attachment, the wall of one building shall not receive support from nor apply pressure to the wall of the other building.

(F)   If a portion of any Building Area is at one point in time paved and used as Common Area, such portion may be subsequently used for building purposes provided that all parking requirements and other provisions relating to such Tract are complied with.  Likewise, such building may be subsequently razed, and until replaced, the area shall thereafter be deemed part of the Common Area.

(G)   No building or other structure (exclusive of any freestanding sign referred to in Exhibit D hereof) shall exceed the following height restrictions:

        (i)   On the Target Tract - 30 feet

        (ii)  On the Developer Tract - 30 feet [other than Building Area occupied or to be occupied by a department store; for purposes of this 3.3 (G) (ii), a "department store" is defined to mean any retail store having a size of thirty-nine thousand (39,000) square feet of gross leasable area or more, which will not exceed forty (40) feet.]

The height of any building shall be measured perpendicular from the finish grade of the interior floor of the Building Area to the top of the highest single portion of the building, including any parapet, penthouse, mechanical equipment or similar appurtenance located on the roof of such building; the height of any structure shall be measured from its base to the highest single point.

-19-

LIBER **1396** PAGE **0980**

## ARTICLE IV
## MAINTENANCE AND REPAIR

4.1   Utilities.

(A)   Each Party shall repair and maintain in first-class condition all utility facilities, lines, and systems located on its Tract that serve its Tract unless the same are dedicated to and accepted by a public or quasi-public utility or authority.

(B)   The grantee of a utility easement referred to in 2.2 (A) shall maintain and repair at its cost any facilities installed pursuant to such grant which exclusively serve such grantee's Tract unless the same are granted or dedicated to and accepted by a utility or a governmental agency acceptable to the grantor which agrees to maintain and replace the same.   Any maintenance and repair of nondedicated utilities located on another Party's Tract shall be performed only after two (2) weeks' notice to the grantor (except in an emergency the work may be initiated with reasonable notice) and shall be done after normal business hours whenever possible and shall otherwise be performed in such a manner as to cause as little disturbance in the use of the grantor's Tract as is practicable under the circumstances.   Any Party performing or causing to be performed maintenance or repair work agrees to promptly pay all costs and expenses associated therewith, to diligently complete such work as quickly as possible and to promptly clean the area and restore the affected portion of the Common Area to a condition equal to or better than the condition which existed prior to the commencement of such work.

4.2   Common Area.

(A)   Each Party agrees at its sole cost and expense to maintain or cause to be maintained those portions of the Common Area located on its Tract in a first-class condition and in compliance with all applicable governmental laws, rules, regulations, orders, and ordinances and the provisions of this OEA.

LIBER 1396 PAGE 0981

(B)   The  minimum  standard  of  maintenance  for  the improved Common Area shall be comparable to that followed in other first-class retail developments of comparable size in the State of Michigan and shall include, but not be limited to, the following:

(i)   Maintain, repair and resurface all drive and parking areas to keep the same in a smooth and evenly covered condition,  and  sweep  and  clean  the  same,  as  needed,  and restripe and patch said areas as necessary, but not less often than every second year.  Such activities shall, to the extent possible, be scheduled to occur prior to or after normal business hours of the Shopping Center.

(ii)  Keep the Common Areas reasonably free of papers, debris, filth, refuse, ice and snow to the extent necessary to keep the same in a first-class, clean, and orderly condition.

(iii) Install and maintain appropriate directional signs and markers, and replace the same as necessary.

(iv)  Illuminate the drive and parking areas, and maintain and replace lighting facilities, bulbs and ballasts, and pay all electric consumption for said illumination.

(v)   Maintain all landscaped areas, including the replacement of shrubs and other landscaping as necessary, and maintain any automatic sprinkler system serving the landscaped areas.

(vi)  Clean,  sweep,  maintain,  and  repair  all sidewalks and curbs.

(vii) Store all trash and garbage emanating from the Common Areas in adequate, screened containers and provide for regular collection of same.

(C)   In consideration for the Developer's assumption of some of Target's Common Area maintenance obligations (as hereinafter set forth), Target shall pay to Developer an annual Common Area Maintenance charge ("CAM charge") equal to forty cents (40¢) per square foot of Floor Area on the Target Parcel for each calendar year

-21-

LIBER 1396 PAGE 0982

of the term of the OEA (on a prorated basis for any period less than a full calendar year). Said annual CAM charge shall be paid in equal monthly installments, in advance, on the first day of each month during the term of the OEA, commencing on the date of this OEA. Developer shall perform the following obligations on behalf of Target:

(i)   Make minor repairs to all drives and parking areas to keep the same in a smooth and evenly covered condition (any replacement or resurfacing shall only be performed at the request of Target by Developer, at Target's expense, which is not included in the above CAM charge) and sweep and clean the same as needed, and restripe said areas as necessary but not less often than every second year.

(ii)   Keep the Common Areas reasonably free of papers, debris, filth, refuse, ice and snow to the extent necessary to keep the same in a first-class, clean, and orderly condition.

(iii) Install and maintain appropriate directional signs and markers, and replace the same as necessary.

(iv)   Maintain all landscaped areas on the Target Parcel including the replacement of shrubs and other landscaping as necessary, and maintain any automatic sprinkler system (if any) serving the landscaped areas (except for any landscaped areas or automatic sprinkler system located inside the Target Building curb line).

(v)   Clean and sweep all sidewalks.

(vi)   Store all trash and garbage emanating from the Common Areas in adequate, screened containers and provide for regular collection of same.

The CAM charge shall be increased in accordance with the following formula. As used herein, "Price Index" shall mean the Consumer Price Index, All Urban Consumers (U. S. City Average), as compiled and published by the Bureau of Labor Statistics, United

-22-

LIBER 1396 PAGE 0983

States Department of Labor, as revised from time to time for base averages. If such Price Index should in the future be compiled on a different basis, appropriate adjustments will be made for purposes of computations under this clause. If the United States Department of Labor no longer compiles and publishes such Price Index, any comparable index published by any other branch or department of the Federal Government shall be used for the purpose of computing the adjustments herein provided for, and if no such index is compiled and published by any branch or department of the Federal Government, the statistics reflecting cost of living changes as compiled by any institution, organization or individual generally recognized as an authority by financial and insurance institutions shall be used as a basis for such adjustments.

Recognizing the length of the term of this OEA and inflationary tendencies in recent years, Target agrees that in the event the Price Index reflects an increase in the cost of living over and above such costs as reflected by such Price Index as it exists for the month of December, 1992 (hereinafter called the "Base Index"), the annual CAM charge payable hereunder shall be adjusted as follows:

(a)   There shall be an adjustment in the annual CAM charge commencing with the date of this OEA, based upon the percentage increase (if any) between the Base Index and the Price Index for the month of December immediately preceding such adjustment.

The percentage increase thus determined shall be multiplied by the annual CAM charge set forth in this OEA, and the total amount of such annual CAM charge plus the amount so determined shall constitute the annual CAM charge for the remainder of the first calendar year of the term of this OEA.

(b)   There shall be an annual adjustment in the annual CAM charge for each calendar year commencing with the first full calendar year after the date of this OEA based upon

-23-

LIBER 1396 PAGE 0984

the percentage increase (if any) between the Base Index and the Price Index for the month of December immediately preceding such adjustment.

The percentage increase thus determined shall be multiplied by the annual CAM charge set forth in this Agreement, and the total amount of such annual CAM charge plus the amount so determined shall constitute the annual CAM charge for the calendar year next ensuing.

(c) The same formula shall be used in adjusting the annual CAM charge for the second full calendar year of the term of this OEA and each year thereafter, but no such adjustment shall result in a reduction of the annual CAM charge below the greater of: (1) the annual CAM charge set forth in this OEA; or (2) the annual CAM charge thereafter payable as determined in accordance with subsections (a), (b) and (c) hereof.

(D) In the event any governmental taxing authority acting under any present or future law, ordinance or regulation duly enacted and not set aside by reason of litigation or modified or repealed, should levy, assess or impose a tax, excise and/or assessment (other than a net income or franchise or similar type tax), hereinafter referred to as "Tax", upon the payment made by Target pursuant to this OEA, Target shall pay such Tax or, in the event such Tax is payable by Developer, shall reimburse Developer for the amount thereof actually paid by Developer to the governmental authority on the amount of Target's payment to Developer. Such reimbursement, if necessary, shall be made within thirty (30) days after Developer notifies Target of the amount paid by Developer on behalf of Target. Developer agrees that in no event shall such Tax exceed three percent (3%) of the CAM charge payable hereunder.

(E) In the event any of the Common Area is damaged or destroyed by any cause other than normal wear and tear, whether insured or uninsured, during the term of this OEA, the Party upon whose Tract such Common Area is located shall repair or restore such

-24-

LIBER 1396 PAGE 0985

Common Area at its sole cost and expense with all due diligence. Notwithstanding the foregoing, but nevertheless subject to 5.4 (C), in the event such damage or destruction of Common Area is caused in whole or in part by another Party or third Person, the Party obligated to make such repair or restoration reserves and retains the right to proceed against such other Party or third Person for indemnity, contribution or damages.

4.3    Building Improvements.

(A)    After completion of construction, each Party covenants and agrees to maintain and keep the building improvements located on its Tract in first-class condition and state of repair, in compliance with all governmental laws, rules, regulations, orders, and ordinances exercising jurisdiction thereover, and in compliance with the provisions of this OEA. Each Party further agrees to store, or caused to be stored, all trash and garbage in adequate containers, to locate such containers so that they are not readily visible from the front parking area, and to arrange for regular removal of such trash or garbage. The foregoing shall not apply to the normal trash containers used for the deposit of refuse by customers and invitees of the Shopping Center.

(B)    In the event any of the building improvements are damaged by fire or other casualty (whether insured or not), the Party upon whose Tract such building improvements are located immediately shall remove the debris resulting from such event and provide a sightly barrier and within a reasonable time thereafter, if such event occurs during the first fifteen (15) years of the term hereof, shall repair or restore the building improvements so damaged, such repair or restoration to be performed in accordance with all provisions of this OEA. If such event occurs after the first fifteen (15) years of the term hereof, the Party may (i) erect other building improvements in such location, provided all provisions of this OEA are complied with, or (ii) demolish the damaged portion of such building improvements and restore the area to an attractive

-25-

LIBER 1396 PAGE 0986

condition, in which event the area shall be Common Area until a replacement building is erected. After the expiration of the first fifteen (15) years of the term hereof, such Party shall have the option to choose which of the foregoing alternatives to perform, but such Party shall be obligated to perform one of such alternatives. Such Party shall give notice to each other Party within ninety (90) days from the date of such casualty of which alternative it elects. Notwithstanding any language to the contrary elsewhere in this Section 4.3, Target and Developer agree that with regard to Unit 395 occupied by Phar-Mor (its successors or assigns), Unit 200 occupied by Elder-Beerman (its successors or assigns), Unit 300 occupied by Sears (its successors or assigns), and Unit 650 occupied by J.C. Penney Company (its successors or assigns), Developer's obligations with regard to rebuilding these units shall be governed by the casualty clauses set forth in the Lease Agreements entered into with these tenants, their successors and assigns, as set forth on Exhibit G attached hereto and made a part hereof.

## ARTICLE V
## OPERATION OF THE SHOPPING CENTER

5.1   Operating Covenants/Uses.

(A)   Developer's Operating Covenant.   Developer covenants with Target, for a period of ten (10) years following Target's initial opening for business and for so long thereafter as two (2) or more Major Store Buildings are being operated as single retail stores, Developer shall continuously operate the enclosed mall and at least sixty percent (60%) or more of the Floor Area of the Mall Store Buildings, with reasonably even distribution thereof throughout the enclosed mall, in a manner consistent with best standards of reasonable shopping center practices. Notwithstanding the foregoing, this operating covenant shall terminate as to Target at such time as Target permanently ceases to be open for business to the public.

-26-

LIBER 1396 PAGE 0987

(B)   Target's Operating Covenant.   Target covenants
with Developer that it will use its best efforts to open its store in
the Target Building, and its entrance to the enclosed mall (which
shall be and remain open during Tenant's Operating Covenant a minimum
of thirty (30) feet in width), on or before August 1, 1994 and that
Target will thereafter, for a period of ten (10) years from the date
that Target first opens for business in the Target Building, operate
or cause to be operated in the Target Building:   During the first
five (5) year period after the date Target first opens, a department
store under the trade name of "Target" or such other trade name as is
now being used or as may hereafter be used at the time in question by
a majority of its stores of like type in the States of Michigan and
Ohio; and during the next five (5) year period, a department store.
Target shall be released from its operating covenant as set forth
above in the event at any time following Target's initial opening for
business less than seventy-five percent (75%) of the Mall Store
Buildings shall be operating as mall stores, with reasonably even
distribution thereof throughout the enclosed mall; provided, however,
Developer shall have six (6) months after receipt of written notice
from Target within which to cure such deficiency before such release
shall be effective.   From and after the expiration or termination of
Target's Operating Covenant, should Target elect in the exercise of
its sole and absolute discretion to conduct any retail business in
the Target Building, then Target shall keep open the Target
Building's entrance (which shall have a minimum width of thirty [30]
feet) to the enclosed mall during such hours as Target elects to keep
the Target Building open for business.

(C)   Uses.   In addition to the above Operating
Covenants, the following restrictions shall be applicable to the
Developer Tract and the Target Tract:

No part of the Shopping Center shall be used for
other than retail sales or services or commercial purposes,
provided any retail services located on each Tract shall be of

-27-

LIBER 1396 PAGE 0988

the type defined below and shall in no event be located in
more than five percent (5%) of the total Floor Area on such
Tract.  Retail services as to each Tract shall mean retail
financial institutions, real estate and stock brokerage
facilities, travel agencies, medical and dental offices, and
similar uses providing services directly to the public for
fees.

Notwithstanding the foregoing, no use or service
shall be permitted in the Shopping Center which is
inconsistent with the operation of a first-class enclosed
mall retail shopping center. Without limiting the generality
of the foregoing, the following uses or services shall not be
consistent with the concept of a first-class retail Shopping
Center:

(i)    Any use which emits an obnoxious odor,
noise, or sound which can be heard or smelled outside of
any building in the Shopping Center; provided however,
that this prohibition shall not prohibit a paging
system;

(ii)    Any operation primarily used as a warehouse
operation and any assembling, manufacturing, distilling,
refining, smelting, agricultural, or mining operation;

(iii)    Any "second hand" store or "surplus" store;

(iv)    Any mobile home park, trailer court, labor
camp, junkyard, or stockyard (except that this provision
shall not prohibit the temporary use of construction
trailers during periods of construction, reconstruction
or maintenance);

(v)    Any dumping, disposing, incineration, or
reduction of garbage (exclusive of garbage compactors
located in the rear of any building);

(vi)    Any fire sale, bankruptcy sale (unless
pursuant to a court order) or auction house operation;

LIBER 1396 PAGE 0989

(vii)      Any central laundry, dry cleaning plant, or
laundromat; provided, however, this prohibition shall
not be applicable to on-site service oriented to pickup
and delivery by the ultimate consumer, including nominal
supporting facilities, as the same may be found in
retail shopping districts in the metropolitan area where
the Shopping Center is located;

(viii)      Used car lot or auto body repair shop
(provided this restriction shall not exclude a
tire/battery or service operation such as Firestone,
Goodyear or Midas Muffler); and provided further that
this restriction shall not exclude a vehicle dealership
entirely within a Building and occupying up to 5000
square feet for sales or leasing of new automobiles;

(ix)      Any bowling alley;

(x)      Any skating rink;

(xi)      Any living quarters, sleeping apartments, or
lodging rooms;

(xii)      Any veterinary hospital or animal raising
facilities (except that this prohibition shall not
prohibit pet shops);

(xiii)      Any mortuary;

(xiv)      Any establishment selling or exhibiting
pornographic materials;

(xv)      Any bar, tavern, or other establishment
whose reasonably projected annual gross revenues from
the sale of alcoholic beverages for on-premises
consumption exceeds sixty percent (60%) of the gross
revenues of such business; This provision shall not
exclude restaurants which shall be defined as an
establishment whose reasonably projected annual gross
revenues from the sale of alcoholic beverages for
on-premises consumption is less than sixty percent (60%)
of the gross revenues of such business;

-29-

LIBER 1396 PAGE 0990

(xvi)     A car wash;

(xvii)     Any amusement arcade in Units 600, 610, 615, 105, 110 and 120 as set forth on Exhibit X-1 attached hereto and made a part hereof;

(xviii)     Any theater, except the theater located in Unit 700, as set forth on Exhibit X;

(xix)     Any flea market, pool/billiard hall, or dance hall.

(D)     The following use and occupancy restrictions shall be applicable to the Developer Tract:

(i)     Any health spa within two hundred (200) lineal feet of the Target Building;

(ii)     No toy store exceeding 5,000 square feet of Floor Area shall be permitted within 200 lineal feet of the Target building; however, there shall be no restriction on any size toy store beyond the 200 foot restriction set forth above.

(E)     The following use and occupancy restrictions shall be applicable to the Developer Tract and to the Target Tract:

(i)     No restaurant shall be located thereon within one hundred (100) feet of the other Party's Tract;

(ii)     No more than 20,000 square feet of Floor Area may be used for office purposes;

(F)     No merchandise, equipment or services shall be displayed, offered for sale or lease, or stored within the Common Area; provided however, that the foregoing prohibition shall not be applicable to (i) the storage of the shopping carts on either Tract; (ii) the seasonal display and sale of bedding plants on the sidewalk in front of the building located on the Target Tract in such a manner as not to prevent pedestrian access on such sidewalk, (iii) kiosks in the common mall area, except for the area crosshatched in red on Exhibit X-1 (Developer, however, shall be permitted two (2) temporary

-30-

LIBER 1396 PAGE 0991

kiosks [excluding pushcarts] in the area crosshatched in red on
Exhibit X-1 provided:

> [a]   they do not exceed ten feet [10'] in width,
>
> [b]   they are of a see-through design,
>
> [c]   they do not dispense food or beverages, and
>
> [d]   they are not located within fifty feet
>       [50'] of Target's mall entrance);

or (iv) temporary Shopping Center promotions on the Developer Tract,
such as sidewalk sales or mall promotions ("temporary" shall be
defined to mean not more than three [3] days in duration and not more
frequently than monthly), so long as they do not interfere with
pedestrian access in the common mall or on the sidewalks being used.

(G)   No Permittee shall be charged for the right to use
the Common Area (this restriction shall not apply to Merchants
Association or Marketing Fund promotions and kiosks).

(H)   Each Party shall use its best efforts to cause the
employees of the Occupants of its Tract to park their vehicles only
on such Tract.

(I)   The restrictions contained in Sections 5.1 (D) and
5.1 (E) shall not be applicable to any occupant in possession and
doing business as of the date of this OEA, their successors or
assigns.

5.2   Lighting.

(A)   From the date of mutual execution of this OEA,
each Party hereby covenants and agrees to keep its Tract fully
illuminated each day from dusk to not later than 10:00 p.m., and
further agrees to keep any exterior building security lights on from
dusk until dawn.

(B)   It is recognized that business establishments
within the Shopping Center may be open for business at different
hours, and that the owner of one Tract upon which a business
establishment is open later may wish to have the Common Area lights
on another Tract continue to burn beyond the required period.
Accordingly, the owner of such Tract ("Requesting Owner") shall have

-31-

LIBER 1396 PAGE 0992

the right, at any time to require the owner of the other Tract ("Requested Owner") to keep its Common Area lights on until a later hour as stipulated by the Requesting Owner; provided that the Requesting Owner notifies the Requested Owner of such request not less than fifteen (15) days in advance.  The Requesting Owner shall state the period during which it wishes the lights to be kept on to a later hour and shall pay to the Requested Owner a prepayment deposit as follows:

(1)   If the period is less than thirty (30) days, then the deposit shall be one hundred ten percent (110%) of the reasonable cost (as estimated by the Requested Owner) of electrical power for such later hours to be incurred by the Requested Owner).

(2)   If the period is greater than or equal to thirty (30) days, then the deposit shall be one hundred ten percent (110%) of the reasonable cost (as estimated by the Requested Owner), of electrical power during the first thirty (30) days of the period for such later hours to be incurred by the Requested Owner.  If the period is greater than thirty (30) days, then the Requesting Owner shall renew such prepayment deposit at the end of each thirty (30) day period.

The Requesting Owner agrees to pay one hundred ten percent (110%) of the cost to the Requested Owner of electrical power to provide such extra-hours illumination.  If the Requested Owner is of the opinion that the deposits made by the Requesting Owner do not cover one hundred ten percent (110%) of such costs, the Parties shall attempt to agree to the cost of such electrical power and if they cannot do so, then the amount the Requesting Owner is obligated to pay shall be determined from the power costs as estimated by the electric utility company furnishing such power, or if the utility fails to do so, by a reputable engineer.  Upon the failure of a Requesting Owner to pay the aforesaid amount or renew a deposit as required hereby, the Requested Owner shall have the right to discontinue such additional lighting and to exercise other remedies herein provided.  Any such

-32-

LIBER 1396 PAGE 0993

request for additional lighting may be withdrawn or terminated at any time by written notice from the Requesting Owner, and a new request or requests for changed hours may be made from time to time.

5.3   Signs.

(A)   Target shall have the right, subject to the provisions of Section 5.3 (C), to maintain not more than four (4) signs, electrical or non-electrical, on the exterior of the Target Building, but not more than one (1) sign on each exterior face of the building, including one (1) sign on the storefront facing the enclosed mall.   Each of the signs shall be parallel to the Target Building.   The size and design of all such signs shall be in accordance with drawings which have been approved by Developer. Target, at its sole cost and expense, shall have the right to replace or change its signs to any other type of signs then being used by Target in Target Stores in the States of Michigan and Ohio.   In the event Target's original signs are so replaced or changed, such new signs shall be of the same size, in the same location, and of the same quantity as the original signage.   Target also shall have the right to construct and maintain a pylon sign adjacent to Telegraph Road in the area designated on Exhibit X.   **The design of said pylon sign shall be as set forth on Exhibit D attached hereto and made a part hereof.  Said pylon sign shall also advertise Frenchtown Square Mall.   It is agreed by Developer and Target that each party shall illuminate and repair its section of said sign and that the repair and maintenance of the structure shall be shared equally by Developer and Target.**

(B)   Developer will, at Developer's expense, construct and maintain a pylon sign at the location indicated therefor on North Monroe Street, which location is set forth on Exhibit X.   Such pylon sign shall set forth only the name of the Shopping Center.   In addition, Developer shall have the right to construct an additional pylon sign adjacent to North Monroe Street which shall set forth only the name of the Shopping Center and may contain an announcement panel, a theater attraction panel, and/or a restaurant identification sign.   In addition, Developer shall have the right to construct and maintain a pylon sign adjacent to Telegraph Road which shall set

-33-

(ljłp 1396 ᵖᵃᵍᵉ 0994

forth only the name of the Shopping Center and may contain an announcement panel, a theater attraction panel, and/or a restaurant identification sign, in the area designated on Exhibit X.  During the term of this OEA, such pylon signs shall be kept in good order and repair by Developer and lighted during the evening hours until the Shopping Center is closed for business, or 10:00 p.m., whichever is later.

(C)   Target, as respects the Target Building, and Developer, as respects the buildings on the Developer Parcel, agree that no sign will be installed on the roof of any such building or which will project above the top of any parapet wall or above the roof line if it is to be affixed to the side of a building not having a parapet wall; provided, however, that if a penthouse extends above any such wall a sign or signs not projecting above the roof line of such penthouse may be installed on any side thereof.

(D)   Developer shall conform and cause the tenants and occupants of the Shopping Center to conform to the Sign Criteria attached hereto as Exhibit H.  However, the occupants of the Major Store Buildings shall have the rights granted to Target in this article with regard to their buildings.

(E)   Target and Developer acknowledge that all signs existing as of the date of this OEA may not comply with the provisions of this Section 5.3, and therefore Target and Developer agree that all signs existing as of the date of this OEA shall be deemed approved.

5.4   Insurance.

(A)   Each Party with respect to its Tract shall maintain or caused to be maintained in full force and effect Comprehensive General Liability Insurance, including Personal Injury Liability Insurance and Contractual Liability Insurance with a financially responsible insurance company or companies licensed in the state where the Shopping Center is located, with a minimum Best's rating of A:X; such insurance to provide for a limit of not less than Three Million Dollars ($3,000,000) for bodily injury or death to any one person, for a limit of not less than Five Million Dollars ($5,000,000) for bodily injury or death to any number of persons

-34-

LIBER 1396 PAGE 0995

arising out of any one occurrence, and for a limit of not less than One Million Dollars ($1,000,000) for any property damage. Additionally, such insurance shall include the following minimum requirements:

   (i) shall provide coverage on an occurrence basis;

   (ii) shall provide that the policy may not be canceled or materially reduced in amount or coverage without at least thirty (30) days' prior written notice by the insurer to each of the other Parties;

   (iii) shall include the other Parties as additional insureds;

   (iv) shall provide for severability of interests;

   (v) shall provide that an act or omission of one of the insureds or additional insureds which would void or otherwise reduce coverage, shall not reduce or void the coverage as to the other additional insureds or the insured, respectively.

Such insurance shall specifically extend to the contractual obligation of the insured Party arising out of the indemnification obligations set forth in the next sentence. Each Party ("Indemnitor") covenants and agrees to indemnify, defend and hold harmless the other Party ("Indemnitee") from and against all claims, costs, expenses and liability (including reasonable attorney's fees and cost of suit incurred in connection with all claims) including any action or proceedings brought thereon, arising from or as a result of the injury to or death of any person, or damage to the property of any person or entity which shall occur on the Tract owned by each Indemnitor, except for claims caused by the negligence or willful act or omission of such Indemnitee, its licensees, concessionaires, agents, servants, or employees, or the agents, servants, or employees of any licensee or concessionaire thereof. The Parties agree to review the minimum limits set forth above every ten (10) years and further agree to adjust such limits if circumstances warrant.

-35-

LIBER 1396 PAGE 0996

(B)    Notwithstanding Section 5.4 (A) above, Developer
and Target agree that, commencing with the time when Developer
commences to perform maintenance of the Common Areas on the Target
Parcel in accordance with the provisions of Section 4.2(B) hereof,
and for so long thereafter as Developer shall be performing such
maintenance, Developer and Target (hereinafter called the "Covered
Parties") will continuously maintain joint general public liability
insurance against claims for personal and bodily injury or death and
property damage occurring on any Common Area (other than the enclosed
mall) or on any other area outside of a building but within the
Shopping Center. Such insurance shall afford protection to the limit
of not less than $5,000,000 per occurrence. Said insurance shall be
effected under a joint policy, under the terms of which the Covered
Parties shall each be a "named insured". Developer is hereby
designated the agent of the Covered Parties for the purpose of
obtaining such insurance, provided that the approval of Target as to
the insurer, terms and cost, shall first be obtained, Target having
theretofore been furnished an analysis of such cost. Developer shall
deliver a copy of such insurance policy to Target. The premium for
said policy shall be apportioned between the Covered Parties on the
basis of the Floor Area of each Parcel of each Covered Party, and
Target's share of said premium shall be payable to Developer within
fifteen (15) days after Developer submits statements therefor to
Target.

(C)    Effective upon the construction of improvements on
its Tract, each Party will carry or cause to be carried, fire
insurance with an extended coverage endorsement with a financially
responsible insurance company or companies licensed in the state
where the Shopping Center is located, with a minimum Best's rating of
A:X, in an amount at least equal to eighty percent (80%) of the
replacement cost (exclusive of the cost of excavation, foundations,
and footings) of the buildings and improvements, such coverage
extending at least to the following perils:    loss or damage by fire,

-36-

LIBER 1396 PAGE 0997

windstorm, cyclone, tornado, hail, explosion, riot, riot attending a strike, civil commotion, malicious mischief, vandalism, aircraft, vehicle, smoke damage, and sprinkler leakage.

Each Party (the "Releasing Party") hereby releases and waives for itself and on behalf of its insurer, any other Party (the "Released Party") from any liability for any loss or damage to all property of such Releasing Party located upon any portion of the Shopping Center, which loss or damage is of the type generally covered by fire insurance with an extended coverage endorsement, irrespective either of any negligence on the part of the Released Party which may have contributed to or caused such loss, or of the amount of such insurance required or actually carried.  Each Party agrees to use its best efforts to obtain, if needed, appropriate endorsements to its policies of insurance with respect to the foregoing release; provided, however, that failure to obtain such endorsements shall not affect the release hereinabove given.  Each Party ("Indemnitor") covenants and agrees to indemnify, defend and hold harmless each other Party ("Indemnitee") from and against all claims asserted by or through any Permittees of the Indemnitor's Tract for any loss or damage to the property of such Permittee located upon the respective Indemnitor's Tract, which loss or damage is of the type generally covered by fire insurance with an extended coverage endorsement, irrespective of any negligence on the part of the Indemnitee which may have contributed to or caused such loss.

(D)   Prior to commencing any construction activities within the Shopping Center, each Party shall obtain or require its contractor to obtain and thereafter maintain so long as such construction activity is occurring, at least the minimum insurance coverages set forth below:

(i)   Workers' Compensation - statutory limits;

(ii)   Employers Liability - $100,000;

(iii)  Comprehensive General and Comprehensive Auto Liability as follows:

-37-

LIBER 1396 PAGE 0998

(a)   Bodily   Injury   -   $1,000,000   per occurrence;

(b)   Property   Damage   -   $1,000,000   per occurrence;

(c)   Independent   Contractors   Liability; same coverage as set forth in (a) and (b) above;

(d)   Products/Completed Operations Coverage which shall be kept in effect for two (2) years after completion of work;

(e)   "XCU"   Hazard   Endorsement,   if applicable;

(f)   "Broad   Form"   Property   Damage Endorsement;

(g)   "Personal Injury" Endorsements;

(h)   "Blanket   Contractual   Liability" Endorsement.

If the construction activity involves the use of another Party's Tract, then the owner of such Tract shall be named as an additional insured and such insurance shall provide that the same shall not be canceled without at least thirty (30) days' prior written notice to the named insureds.  If such insurance is canceled or expires then the constructing Party shall immediately stop all work on or use of another Party's Tract until either the required insurance is reinstated or replacement insurance obtained.

(E)   The insurance described above may be carried under (i) an individual policy covering this location, (ii) a blanket policy or policies which includes other liabilities, properties and locations of such Party, (iii) a plan of self-insurance, provided that the Party so self-insuring has and maintains $40,000,000 or more of net current assets as evidenced by such Party's annual report that is audited by an independent certified public accountant, or (iv) a combination of any of the foregoing insurance programs.  To the extent any deductible is permitted or allowed as a part of any insurance policy carried by a Party in compliance with Section 5.4,

-38-

LIBER 1396 PAGE 0999

such Party shall be deemed to be covering the amount thereof under an informal plan of self-insurance; provided, however, that in no event shall any deductible exceed $500,000 unless such Party qualifies for self-insurance pursuant to (iii) above or such Party has $10,000,000 or more of net current assets. Each Party agrees to furnish to any Party requesting the same, a certificate(s) of insurance evidencing that the insurance required to be carried by such Requested Party is in full force and effect. For the purpose of this paragraph, if a Guarantor of this OEA has $10,000,000 or more of net current assets, such amount shall be sufficient to qualify the Party whose obligations are being guaranteed to permit such $500,000 deductible mentioned above. In the event Target or Developer assigns its interest in this OEA, the limitation on the deductible of $500,000 shall be decreased to $100,000 as regards said assignee.

5.5   <u>Taxes and Assessments</u>. Each Party shall pay or cause to be paid prior to delinquency, all taxes and assessments with respect to its Tract, the buildings, and improvements located thereon and any personal property owned or leased by such Party in the Shopping Center, provided that if the taxes or assessments or any part thereof may be paid in installments, the Party may pay each such installment as and when the same becomes due and payable. Nothing contained in this subsection shall prevent any Party from contesting at its cost and expense any such taxes and assessments with respect to its Tract in any manner such Party elects, so long as such contest is maintained with reasonable diligence and in good faith and such installment(s) have been previously paid under protest to avoid having the property being in any danger of being lost due to nonpayment. At the time as such contest is concluded (allowing for appeal to the highest appellate court), the contesting Party shall promptly pay all such taxes and assessments determined to be then due and owing, together with all interest, penalties and costs thereon.

5.6   <u>Liens</u>. In the event any mechanic's lien is filed against the Tract of one Party as a result of services performed or

-39-

LIBER 1396 PAGE 1000

materials furnished for the use of another Party, the Party permitting or causing such lien to be so filed agrees to cause such lien to be discharged prior to entry of final judgment (after all appeals) for the foreclosure of such lien and further agrees to indemnify, defend, and hold harmless the other Party and its Tract against liability, loss, damage, costs or expense (including reasonable attorney's fees and costs of suit) on account of such claim of lien. Upon request of the Party whose Tract is subject to such lien, the Party permitting or causing such lien to be filed agrees to promptly cause such lien to be released and discharged of record, either by paying the indebtedness which gave rise to such lien or by posting bond or other security as shall be required by law to obtain such release and discharge. Nothing herein shall prevent a Party permitting or causing such lien from contesting the validity thereof in any manner such Party chooses so long as such contest is pursued with reasonable diligence. In the event such contest is determined adversely (allowing for appeal to the highest appellate court), such Party shall promptly pay in full the required amount, together with any interest, penalties, costs, or other charges necessary to release such lien.

ARTICLE VI

MISCELLANEOUS

6.1   <u>Default.</u>

(A)   If any Party fails to comply with any provision herein ("Defaulting Party"), then any other Party ("Non-Defaulting party") may, upon forty-five (45) days' prior written notice to the Defaulting Party, proceed to cure the default (and shall have a license to do so) by the payment of money or performance of some other action for the account of the Defaulting Party. The foregoing right to cure shall not be exercised if within the forty-five (45) day notice period (i) the Defaulting Party cures the default, or (ii) if the default is curable but cannot reasonably be cured within

-40-

LIBER 1396 PAGE 1001

that time period, the Defaulting Party begins to cure such default within such time period and diligently pursues such action to completion. The forty-five (45) day notice period shall not be required if, using reasonable judgment, the Non-Defaulting Party deems that an emergency exists which requires immediate attention. In the event of such an emergency, the Non-Defaulting Party shall give whatever notice to the Defaulting Party as is reasonable under the circumstances.

(B)   Within ten (10) days of written demand, the Defaulting Party shall reimburse the Non-Defaulting Party for any sum reasonably expended by the Non-Defaulting Party to cure the default, together with interest thereon.

(C)   In the event any Party shall institute any action or proceeding against another Party relating to the provisions of this OEA, or if any default hereunder, or to collect any amounts owing hereunder, or if an arbitration proceeding is commenced by agreement of the Parties to any dispute, the unsuccessful litigant in such action or proceeding shall reimburse the successful litigant therein for costs and expenses incurred by the successful litigant in connection with such action or proceeding and any appeals therefrom, including attorneys' fees and court costs.

(D)   All remedies are cumulative and shall be deemed additional to any and all other remedies to which any Party may be entitled in law or in equity. Each Party shall also have the right to restrain by injunction any violation or threatened violation by any other Party of any of the terms, covenants, or conditions of this OEA, or to obtain a decree to compel performance of any such terms, covenants, or conditions, it being agreed that the remedy at law for a breach of any such term, covenant or condition (except those, if any, requiring the payment of a liquidated sum) is not adequate.

6.2   <u>Interest</u>. Wherever and as often as one Party shall not have paid any sum payable hereunder to another Party within five (5) days of the due date, such delinquent Party shall have interest on

-41-

LIBER 1396 PAGE 1002

such amount from the due date to and including the date such payment is received by the Party entitled thereto, at the lesser of:

(A)   The highest rate permitted by law to be paid on such type of obligation by the Party obligated to make such payment or the Party to whom such payment is due, whichever is less; or

(B)   Three percent (3%) per annum in excess of the prime rate from time to time publicly announced by Norwest Bank, Minneapolis National Association or its successor.

6.3   _Estoppel Certificate_.   Each Party agrees that upon written request (which shall not be more frequent that three [3] times during any calendar year) from time to time of any other Party, it will issue to a prospective mortgagee of such other Party or to a prospective successor Party to such other Party, an estoppel certificate stating:

(A)   whether the Party to whom the request has been directed knows of any default by the Requesting Party under this OEA, and if there are known defaults, specifying the nature thereof;

(B)   whether this OEA has been assigned, modified or amended in any way by the Requested Party (and if it has, then stating the nature thereof);

(C)   that to the Requested Party's knowledge, this OEA as of that date is in full force and effect;

Such statement shall act as a waiver of any claim by the Party furnishing it to the extent such claim is based upon facts contrary to those asserted in the statement and to the extent the claim is asserted against a bona fide encumbrancer or purchaser for value without knowledge of facts to the contrary of those contained in the statement, and who has acted in reasonable reliance upon the statement; however, such statement shall in no event subject the Party furnishing it to any liability whatsoever, notwithstanding the negligent or otherwise inadvertent failure of such Party to disclose correct and/or relevant information.

-42-

LIBER 1396 PAGE 1003

6.4   Notices. All notices, demands, statements, and requests ("notice") required or permitted to be given under this OEA must be in writing and shall be deemed to have been properly given or served as of the date of personal delivery or delivery by private overnight mail service (which obtains a receipt for its delivery), or as of the date the same is deposited in the United States mail, prepaid, by registered or certified mail, return receipt requested. The address of the signatories to this OEA is set forth below. In the event a Party shall encumber its Tract by a mortgage and notice of such fact has been given to the Party issuing such notice, demand, statement or request, then a copy of any notice of amounts due or notice of default directed to such mortgaging Party shall also be sent to its mortgagee.

|  |  |
|---|---|
| Target | Dayton Hudson Corporation<br>Target Stores - Real Estate<br>Attn:  Property Administration<br>33 South Sixth Street<br>Minneapolis, Minnesota    55402 |
| Developer | Frenchtown Square Partnership<br>2445 Belmont Avenue<br>P. O. Box 2186<br>Youngstown, Ohio    44504-0186 |

#4573

Any Party shall have the right from time to time and at any time, upon at least ten (10) days' prior written notice thereof in accordance with the provisions hereof, to change its respective address and to specify any other address within the United States of America; provided, however, notwithstanding anything herein contained to the contrary, in order for the notice of address change to be effective it must actually be received; and further provided such address may not be a post office box.

6.5   Approval Rights.   Unless otherwise herein provided, whenever approval is required, such approval shall not be unreasonably withheld or delayed.   Unless provision is made for a specific time period, approval shall be given or withheld within ten

-43-

1396    1004

(10) days of the receipt of the request for approval.   If a
disapproval is not given within the required time period, the
Requested Party shall be deemed to have given its approval.   If a
Party shall disapprove, the reasons therefor shall be stated.   Except
with respect to an approval given by lapse of time, all approvals and
disapprovals shall be in writing.   The "right to approve" herein
reserved by Target and Developer, respectively, shall be assignable
by each, but only to a Party who purchases the total Tract from
either Developer or Target; such successor assignee may also assign
such "right to approve" on the same condition.   If the holder of the
"right to approve" transfers its entire ownership interest prior to
assigning such "right to approve", then the transferee Party shall
immediately become vested with such "right to approve."

     6.6   <u>Condemnation</u>.   In the event of a condemnation or a sale
in lieu thereof concerning a portion or all of the Shopping Center,
the award or purchase price paid for such taking shall be paid to the
Party owning such land so taken; it being the intent of any other
Party who might have an easement or other property interest or right
under this OEA in the land so taken, to release and/or waive such
property interest or right with respect to such award or purchase
price; provided, however, no Party shall have the right to seek an
award or compensation for the loss of its easement right or property
interest.   Notwithstanding the above, 6.6 is not intended to alter
any other agreement which may exist between the owner of the lands so
taken and any person having an interest in said land pursuant to
other contractual relationships.

     6.7   <u>Binding Effect</u>.   The terms of this OEA shall constitute
covenants running with the land and shall inure to the benefit of and
be binding upon the signatories hereto and their respective
successors and assigns who become Parties hereunder.   This OEA is not
intended to supersede, modify, amend, or otherwise change the
provisions of any prior instrument affecting the land burdened
hereby.

-44-

LIBER 1396 PAGE 1005

6.8   <u>Singular and Plural</u>.   Whenever required by the context of this OEA, the singular shall include the plural, and vice versa, and the masculine shall include the feminine and neuter genders, and vice versa.

6.9   <u>Counterparts and Signature Pages</u>.   This OEA may be executed in several counterparts, each of which shall be deemed an original.   The signatures to this OEA may be executed and notarized on separate pages, and when attached to this OEA shall constitute one complete document.

6.10   <u>Negation of Partnership</u>.   None of the terms or provisions of this OEA shall be deemed to create a partnership between or among the Parties in their respective businesses or otherwise, nor shall it cause them to be considered joint venturers or members of any joint enterprise.   Each Party shall be considered a separate owner, and no Party shall have the right to act as an agent for another Party, unless expressly authorized to do so herein or by separate written instrument signed by the Party to be charged.

6.11   <u>Not a Public Dedication</u>.   Nothing herein contained shall be deemed to be a gift or dedication of any portion of the Shopping Center or of any Tract or portion thereof to the general public, or for any public use or purpose whatsoever.   Except as herein specifically provided, no right, privileges or immunities of any Party hereto shall inure to the benefit of any third-party Person, nor shall any third-party Person be deemed to be a beneficiary of any of the provisions contained herein.

6.12   <u>Excusable Delays</u>.   Whenever performance is required of any Party hereunder, that Party shall use all due diligence to perform and take all necessary measures in good faith to perform; provided, however, that if completion of performance shall be delayed at any time by reason of acts of God, war, civil commotion, riots, strikes, picketing or other labor disputes, unavailability of labor or materials, damage to work in progress by reason of fire or other casualty, or any cause beyond the reasonable control of a Party, then

-45-

LIBER 1396 PAGE 1006

the time for performance as herein specified shall be appropriately extended by the amount of the delay actually so caused. The provisions of this section shall not operate to excuse any Party from the prompt payment of any monies required by this OEA.

6.13 <u>Severability</u>. Invalidation of any of the provisions contained in this OEA, or of the application thereof to any person by judgment or court order shall in no way affect any of the other provisions hereof or the application thereof to any other person and the same shall remain in full force and effect.

6.14 <u>Amendments</u>. This OEA may be amended by, and only by, a written agreement signed by all of the then current Parties and shall be effective only when recorded in the county and state where the Shopping Center is located. No consent to the amendment of this OEA shall ever be required of any Occupant or Person other than the Parties, nor shall any Occupant or Person other than the Parties have any right to enforce any of the provisions hereof.

6.15 <u>Captions and Capitalized Terms</u>. The captions preceding the text of each article and section are included only for convenience of reference. Captions shall be disregarded in the construction and interpretation of the OEA. Capitalized terms are also selected only for convenience of reference and do not necessarily have any connection to the meaning that might otherwise be attached to such term in a context outside of this OEA.

6.16 <u>Minimization of Damages</u>. In all situations arising out of this OEA, all Parties shall attempt to avoid and minimize the damages resulting from the conduct of any other Party. Each Party hereto shall take all reasonable measures to effectuate the provisions of this OEA.

6.17 <u>OEA Shall Continue Notwithstanding Breach</u>. It is expressly agreed that no breach of this OEA shall (i) entitle any Party to cancel, rescind or otherwise terminate this OEA, or (ii) defeat or render invalid the lien of any mortgage or deed of trust made in good faith and for value as to any part of the Shopping

-46-

LIBER 1396 PAGE 1007

Center. However, such limitation shall not affect in any manner any other rights or remedies which a Party may have hereunder by reason of any such breach.

6.18 <u>Time</u>. Time is of the essence of this OEA.

6.19 <u>Non-Waiver</u>. The failure of any Party to insist upon strict performance of any of the terms, covenants or conditions hereof shall not be deemed a waiver of any rights or remedies which that Party may have hereunder or at law or equity and shall not be deemed a waiver of any subsequent breach or default in any of such terms, covenants or conditions.

6.20 <u>Liability</u>. If any Party fails to observe, fulfill or perform any covenant, term or condition of this Agreement upon its part to be observed, fulfilled or performed and, as a consequence of such default, any other Party recovers a money judgment against such defaulting Party, such judgment shall be a lien on and shall be satisfied only out of the proceeds of sale received upon execution of such judgment and levy thereon against the right, title and interest of the Defaulting Party in the Defaulting Party's Tract, and no other assets of the Defaulting Party shall be liable for any deficiency. The foregoing limitation on the Parties' liability, however, shall not apply to the obligation of each Party to initially perform the construction of the improvements on its Tract to allow each of the respective Parties to open the building on its tract initially for business.

ARTICLE VII

TERM

7.1 <u>Term of this OEA</u>. This OEA shall be effective as of the date first above written and shall terminate on the expiration of six (6) months following notice of termination by one of the Parties then in interest to the other Party then in interest given at any time after the expiration of the fifty (50) year period following the date hereof; provided, however, that the easements referred to in Article II hereof which are specified as being perpetual or as continuing

-47-

LIBER 1396 PAGE 1008

beyond the term of this OEA shall continue in force and effect as
provided therein.   Upon termination of this OEA, all rights and
privileges derived from and all duties and obligations created and
imposed by the provisions of the OEA, except as relates to the
easements mentioned above, shall terminate and have no further force
or effect; provided, however, that the termination of this OEA shall
not limit or affect any remedy at law or in equity that a Party may
have against any other Party with respect to any liability or
obligation arising or to be performed under this OEA prior to the
date of such termination.

-48-

LIBER 1396 PAGE 1009

SIGNATURE PAGE OF

OPERATION AND EASEMENT AGREEMENT

BETWEEN

DAYTON HUDSON CORPORATION

AND

FRENCHTOWN SQUARE PARTNERSHIP

IN WITNESS WHEREOF, the Parties have caused this OEA to be executed effective as of the day and year first above written.

FRENCHTOWN SQUARE PARTNERSHIP ("Developer")

By _____
Name  Anthony M. Cafaro
Title Authorized Agent

By _____
Name  Ronald J. Ross
Title  Authorized Agent

WITNESSES (as to Developer)

_Sheryn Delbenesse_

_Barbara A. O'Hara_

DAYTON HUDSON CORPORATION ("Target")

By _____
Name
Title    William E. Harder
             Vice President

ATTEST:

By _____
Name         William P. Hise
Title    Assistant Secretary

-49-

LIBER 1396 PAGE 1010

STATE OF Minnesota )
                      ) SS:
COUNTY OF Hennepin )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, William E. Harder and William P. Hrse , known to me to be the Vice President and Asst. Secretary, respectively, of DAYTON HUDSON CORPORATION, the Corporation which executed the foregoing document, who acknowledged that they did sign and seal the foregoing instrument for and on behalf of said Corporation, being thereunto duly authorized by its Board of Directors; that the same is their free act and deed as such officers and the free act and deed of said Corporation.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Minneapolis, Minnesota , this 13th day of July , 1994 .

LAURA R. MILLER
NOTARY PUBLIC—MINN.
HENNEPIN COUNTY
My Comm. Expires Dec 15, 1994

_Laura R. Miller_
                                                    Notary Public

STATE OF OHIO )
                  ) SS:
COUNTY OF MAHONING )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Anthony M. Cafaro and Ronald J. Ross , known to me to be the Authorized Agents of FRENCHTOWN SQUARE PARTNERSHIP, the Partnership which executed the foregoing document, who acknowledged that they did sign the foregoing instrument for and on behalf of said Partnership, being thereunto duly authorized; that the same is their free act and deed as such Authorized Agents and the free act and deed of said Partnership.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Youngstown, Ohio, this 27th day of July , 19 94 .

_Sharyn Albanese_
                                                    Notary Public

SHARYN ALBANESE, Notary Public
STATE OF OHIO
My Commission Expires October 18, 1996

This instrument prepared by:
Ronald J. Ross, Attorney at Law
2445 Belmont Avenue
P.O. Box 2186
Youngstown, Ohio 44504-0186

-50-

 

LIBER 1396 PAGE 1011

## EXHIBIT A

### TARGET PARCEL

DESCRIPTION OF A SURVEY FOR:
9.9050 ACRE PARCEL
PART OF PRIVATE CLAIMS NO. 65 & 353 IN THE NW & NE QUARTERS OF
SECTION 29, AND THE SW QUARTER OF SECTION 20, T6S, R9E,
FRENCHTOWN TOWNSHIP, MONROE COUNTY, MICHIGAN

SITUATED IN PART OF THE TOWNSHIP OF FRENCHTOWN, COUNTY OF MONROE, STATE OF MICHIGAN AND BEING PART OF PRIVATE CLAIMS NO. 65 AND 353 OF THE NORTHWEST AND NORTHEAST QUARTERS OF SETION 29 AND THE SOUTHWEST QUARTER OF SECTION 20, TOWNSHIP 6 SOUTH, RANGE 9 EAST, AND MORE FULLY DESCRIBED AS FOLLOWS:

COMMENCING FOR REFERENCE AT A POINT AT THE INTERSECTION OF THE NORTH LINE OF BEVERLY PARK SUBDIVISION (PLAT VOLUME 7, PAGE 36) EXTENDED AND THE CENTERLINE OF MICHIGAN ROUTE 125; THENCE NORTH 24DEG 15MIN 00SEC EAST, 1876.70 FEET ON AND ALONG SAID CENTERLINE TO A POINT; THENCE NORTH 64DEG 07MIN 54SEC WEST, 60.02 FEET TO A FOUND IRON BAR IN THE NORTHERLY LINE OF A PARCEL OF LAND NOW OR FORMERLY OWNED BY VICTOR BELLESRTI (LIBER 868, PAGE 212); THENCE ON AND ALONG THE WESTERLY RIGHT-OF-WAY LINE OF SAID MICHIGAN ROUTE, 125 NORTH 24DEG 15MIN 00SEC EAST,78.38 FEET TO THE TRUE POINT OF BEGINNING , FOR THE HEREIN DESCRIBED PARCEL;

THENCE NORTH 68DEG 35MIN 36SEC WEST, 254.98 FEET TO A SET IRON ROD;

THENCE NORTH 65DEG 38MIN 55SEC WEST, 325.19 FEET TO A SET IRON ROD;

THENCE SOUTH 68DEG 51MIN 28SEC WEST, 20.12 FEET TO A SET IRON ROD;

THENCE SOUTH 23DEG 51MIN 28SEC WEST, 521.51 FEET TO A FOUND GENERAL LAND OFFICE MONUMENT, PASSING AT 35.21 FEET A FOUND IRON ROD MARKING THE NORTHERLY CORNER OF LANDS NOW OR FORMERLY OWNED BY SAID VICTOR BELLESTRI;

THENCE NORTH 62DEG 07MIN 30SEC WEST, 281.96 FEET TO A FOUND GENERAL LAND OFFICE MONUMENT;.

THENCE NORTH 62DEG 18MIN 27 SEC WEST, 276.23 FEET TO A FOUND GENERAL LAND OFFICE MONUMENT;

THENCE NORTH 64DEG 54MIN 25SEC WEST, 178.35 FEET TO A SET IRON ROD;

THENCE NORTH 24DEG 08MIN 12SEC EAST, 498.76 FEET TO A SET RAILROAD SPIKE;

THENCE SOUTH 65DEG 46MIN 25SEC EAST, 409.48 FEET TO A SET RAILROAD SPIKE;

THENCE NORTH 24DEG 13MIN 35SEC EAST, 33.92 FEET TO A SET RAILROAD SPIKE;

THENCE SOUTH 65DEG 48MIN 58SEC EAST, 284.11 FEET TO A SET IRON ROD;

THENCE NORTH 24DEG 33MIN 42SEC EAST, 35.70 FEET TO A SET IRON ROD;

THENCE SOUTH 65DEG 38MIN 55SEC EAST, 376.75 FEET TO A SET IRON ROD;

THENCE SOUTH 68DEG 35MIN 36SEC EAST, 256.66 FEET TO A SET IRON ROD IN THE WESTERLY RIGHT-OF-WAY OF SAID MICHIGAN ROUTE 125;

THENCE ON AND ALONG SAID RIGHT-OF-WAY LINE, SOUTH 24DEG 15MIN 00SEC WEST, 70.09 FEET TO THE PLACE OF BEGINNING. CONTAINING IN ALL 9.9050 ACRES OF LAND, MORE OR LESS, SUBJECT HOWEVER TO ALL LEGAL HIGHWAYS AND EASEMENTS WRITTEN OR RECORDED.

*Ralph T. Williams*          *Sept. 9, 1993*
RALPH T. WILLIAMS - NO. 19619          DATE

### EXHIBIT A

LIBER 1396 PAGE 1012                    September 23, 1989
                                         Rev. 10/12/93

EXHIBIT B

State of Michigan
County of Monroe
Township of Frenchtown

FRENCHTOWN SQUARE

LEGAL DESCRIPTION

Developer Parcel

Situated in the State of Michigan, County of Monroe, Township of Frenchtown, and being part of Private Claims 65 and 353 of the Northwest and Northeast Quarters of Section 29 and the Southwest Quarter of Section 20, Township 6 South, Range 9 East, and being described as two parcels and more fully described as follows:

PARCEL I

Commencing for reference at a point at the intersection of the north line of Beverly Park Subdivision (Plat Volume 7, Page 36) extended and the centerline of Michigan Route 125;

Thence N 24° 15' 00" E, along the centerline of said Michigan Route 125, a distance of 1876.70 feet to a point;

Thence N 64° 07' 54" W, and leaving the centerline of said Michigan Route 125, a distance of 60.02 feet to a found iron bar in the northerly line of a parcel of land now or formerly owned by Victor Ballestri (Liber 868, Page 212), said iron bar also being on the westerly right-of-way line of Michigan Route 125, said iron bar being the TRUE PLACE OF BEGINNING for the herein described Parcel I;

Thence N 64° 07' 54" W, along the northerly line of said Bellestri lands, a distance of 593.98 feet to a point at the northwasterly corner of said Bellestri lands;

Thence N 23° 51' 28" E, a distance of 35.21 feet to a point;

Thence N 68° 51' 28" E, a distance of 20.12 feet to a point;

Thence S 65° 38' 55" E, a distance of 325.19 feet to a point;

Thence S 68° 35' 36" E, a distance of 254.98 feet to a point on the westerly right-of-way line of Michigan Route 125;

Thence S 24° 15' 00" W, along the westerly right-of-way line of said Michigan Route 125.00, a distance of 78.38 feet and returning to the True Place of Beginning and enclosing an area of 0.8188 acres of land.

Page 1 of 4

EXHIBIT B

Legal Description     LIBER **1396** PAGE **1013**     September 23, 1989
Frenchtown Square                                           Rev. 10/12/93
Developer Parcel

## PARCEL II

Commencing at an iron bar at the intersection of the northerly line of lands now or formerly owned by Victor Bellestri and the westerly right-of-way line of Michigan Route 125, said iron bar also known as the True Place of Beginning of Parcel I;

Thence N 24° 15' 00" E, along the westerly right-of-way line of Michigan Route 125, a distance of 148.47 feet to a point, said point being the TRUE PLACE OF BEGINNING for the herein described parcel of land, said parcel of land being Parcel II;

Thence N 68° 35' 36" W, and leaving the westerly right-of-way line of Michigan Route 125, a distance of 256.66 feet to point;

Thence N 65° 38' 55" W, a distance of 376.75 feet to a point;

Thence S 24° 33' 42" W, a distance of 35.70 feet to a point;

Thence N 65° 48' 58" W, a distance of 284.11 feet to a point;

Thence S 24° 13' 35" W, a distance of 33.92 feet to a point;

Thence N 65° 46' 25" W, a distance of 409.48 feet to a point;

Thence S 24° 08' 12" W, a distance of 498.76 feet to a point;

Thence N 64° 54' 25" W, a distance of 741.30 feet to a General Land Office monument at the Northwest corner of Private Claim 63;

Thence N 24° 41' 20" E, along the easterly line of Private Claim 647, a distance of 1,209.83 feet to a point;

Thence N 23° 59' 24" E, a distance of 77.07 feet to a point, said point being on the southerly line of a 80.00 foot right-of-way of Mall Road, as conveyed to the Board of County Road Commissioners of the County of Monroe from Frenchtown Square Partnership on March 26 of 1992, as recorded in Liber 1214, Page 643;

Thence N 85° 36' 45" E, along the southerly right-of-way line of Mall Road, a distance of 586.19 feet to a P.C. of a curve to the right;

Thence along the arc of a curve to the right and continuing along the southerly right-of-way line of Mall Road, a distance of 479.83 feet to the P.T. of said curve, said curve having a radius of 960.00 feet and a central angle of 28° 38' 15";

Thence S 65° 45' 00" E, continuing along the southerly right-of-way line of Mall Road, a distance of 320.47 feet to a P.C. of a curve to the right;

Page 2 of 4

Legal Description  September 23, 1989
Frenchtown Square    LIBER 1396 PAGE 1014    Rev. 10/12/93
Developer Parcel

Thence along the arc of a curve to the right and continuing along the southerly right-of-way line of Mall Road, a distance of 104.10 feet to the P.T. of said curve, said curve having a radius of 397.62 feet and a central angle of 15° 00' 00";

Thence S 50° 45' 00" E, continuing along the southerly right-of-way of Mall Road, a distance of 113.49 feet to a P.C. of a curve to the left;

Thence along the arc of a curve to the left and continuing along the southerly right-of-way line of Mall Road, a distance of 125.04 feet to the P.T. of said curve, said curve having a radius of 477.62 feet and a central angle of 15° 00' 00";

Thence S 65° 45' 00" E, continuing along the southerly right-of-way line of Mall Road, a distance of 409.00 feet to a point;

Thence S 20° 45' 00" E, continuing along the southerly right-of-way line of Mall Road, a distance of 25.46 feet to a point on the westerly right-of-way line of Michigan Route 125;

Thence S 24° 15' 00" W, along the westerly right-of-way line of Michigan Route 125, a distance of 28.37 to a point, said point being the northeasterly corner of lands now or former owned by Theodore Roberts and Hazel Roberts, as recorded in Liber 281, Page 249;

Thence leaving the westerly right-of-way line of said Michigan Route 125, N 64° 51' 00" W, along the northerly line of said Roberts lands, a distance of 600.23 feet to a point at the northwesterly corner of said Roberts lands;

Thence S 24° 15' 00" W, along the westerly line of said Roberts lands, a distance of 55.00 feet to a point;

Thence continuing along the westerly line of said Roberts lands, S 23° 28' 30" W, a distance of 114.59 feet to a point at the southwesterly corner of said Roberts lands;

Thence S 64° 45' 00" E, along the southerly line of said Roberts lands, a distance of 598.70 feet to a point on the westerly right-of-way line of Michigan Route 125;

Thence S 24° 15' 00" W, along the westerly line of said Michigan Route 125, a distance of 232.60 feet to a point, said point being at the northeasterly corner of lands now or formerly owned by Don's Real Estate;

Thence N 64° 13' 00" W, along the northerly line of said Don's Real Estate lands, a distance of 199.47 feet to a point at the northwesterly corner of said Don's Real Estate lands;

Page 3 of 4

Legal Description  LIBER 1396 PAGE 1015    September 23, 1989
Frenchtown Square
Developer Parcel                                                          Rev. '10/12/93

Thence S 24° 23' 45" W, along the westerly line of Don's Real Estate lands, a distance of 199.97 feet to a point at the southwesterly corner of said Don's Real Estate lands;

Thence S 64° 13' 00" E, along the southerly line of Don's Real Estate lands, a distance of 199.98 feet to a point on the westerly right-of-way line of Michigan Route 125;

Thence S 24° 15' 00" W, along the westerly right-of-way line of said Michigan Route 125, a distance of 406.44 feet and returning to the True Place of Beginning and enclosing an area of 56.1839 acres of land.

The combined total area for Parcel I and Parcel II of the Developer Parcel is 57.0027 acres of land.

Bearings are based on a record bearing of the centerline of Michigan Route 125. This legal description is based on a number of survey's as performed by Poggemeyer Design Group for the Frenchtown Square Mall properties. Reference numbers and dates are as follows: Job No. 7047-002, dated 8/5/93; Job No. 6503009, dated 4/7/89; Job No. 6503007, dated 2/15/89; Job No. 6503004, dated 4/6/88. This legal description is also based on the Frenchtown Square Mall Road Right-of-Way Plans, by Wade-Trim Associates on sheet 7 of 15, Job. No. ZZZ2332-01 with last revision date being 9/89.

The Cafaro Company

Prepared by:  Allison M. H. Carmichael

Approved by:  David M. DeChristofaro, P.E., P.S.
              Professional Engineer, Ohio #46711
              Professional Surveyor, Ohio #7490

File No. 21

Page 4 of 4

LIBER 1396 PAGE 1016

EXHIBIT "C"

(THERE IS NO EXHIBIT "C" TO THIS AGREEMENT)

LIBER 1396 PAGE 1017

# EXHIBIT D



# EXHIBIT D

EXHIBIT "E"
State of Michigan
County of Monroe
Township of Frenchtown

October 16, 1993
Rev. 02/24/94

LIBER 1396 PAGE 1018

FRENCHTOWN SQUARE

## LEGAL DESCRIPTION

Perpetual Easement over Access Road

Situated in the State of Michigan, County of Monroe, Township of Frenchtown, and being part of Private Claims No. 65 and 353 of the Northwest and Northeast Quarters of Section 29 and the Southwest Quarter of Section 20, Township 6 South, Range 9 East, and more fully described as follows:

Commencing for reference at a point at the intersection of the north line of Beverly Park Subdivision (Plat Volume 7, Page 36) extended and the centerline of Michigan Route 125;

Thence N 24° 15' 00" E, along the centerline of said Michigan Route 125, a distance of 1876.70 feet to a point;

Thence N 64° 07' 54" W, and leaving the centerline of said Michigan Route 125, a distance of 60.02 feet to a found iron bar in the northerly line of a parcel of land now or formerly owned by Victor Bellestri (Liber 868, Page 212), said iron bar also being on the westerly right-of-way line of Michigan Route 125;

Thence on and along the westerly right-of-way line of said Michigan Route 125, N 24° 15' 00" E, a distance of 78.38 feet to the **TRUE PLACE OF BEGINNING** for the herein described parcel of land;

Thence N 68° 35' 36" W, and leaving the westerly right-of-way line of said Michigan Route 125, a distance of 254.98 feet to a point;

Thence N 65° 38' 55" W, a distance of 325.19 feet to a point;

Thence S 68° 51' 28" W, a distance of 20.12 feet to a point;

Thence N 65° 46' 25" W, a distance of 9.28 feet to a point;

Thence S 24° 13' 35" W, a distance of 394.22 feet to a point, said point being the P.C. of a curve the right;

Thence along the arc of a curve to the right, a distance of 94.25 feet to the P.T. of said curve, said curve having a radius of 60.00 feet and a central angle of 90° 00' 00";

Thence N 65° 46' 25" W, a distance of 581.71 feet to a point, said point being the P.C. of a curve to the right;

Thence along the arc of a curve to the right, a distance of 78.54 feet to the P.T. of said curve, said curve having a radius of 50.00 feet and a central angle of 90° 00' 00";

Thence N 24° 13' 35" E, a distance of 230.01 feet to a point, said point being the P.C. of a curve to the left;

Page 1 of 2

EXHIBIT "E"

Perpetual Easement Over Access Road                                    October 16, 1993
Frenchtown Square                                                      Rev. 02/24/94
Legal Description            LIBER 1396 PAGE 1019

Thence along the arc of a curve to the left, a distance of 59.76 feet to the
P.T. of said curve, said curve having a radius of 50.00 feet and a central
angle of 68° 28' 38";

Thence N 24° 08' 13" E, a distance of 142.31 feet to a point;

Thence S 65° 46' 25" E, a distance of 40.00 feet to a point;

Thence S 24° 13' 35" W, a distance of 63.00 feet to a point;

Thence S 05° 27' 27" W, a distance of 68.00 feet to a point;

Thence S 24° 13' 35" W, a distance of 291.44 feet to a point, said point being
the P.C. of a curve to the left;

Thence along the arc of a curve to the left, a distance of 31.42 feet to the
P.T. of said curve, said curve having a radius of 20.00 feet and a central
angle of 90° 00' 00";

Thence S 65° 46' 25" E, a distance of 581.71 feet to a point, said point being
the P.C. of a curve to the left;

Thence along the arc of a curve to the left, a distance of 47.12 feet to the
P.T. of said curve, said curve having a radius of 30.00 feet and a central
angle of 90° 00' 00";

Thence N 24° 13' 35" E, a distance of 442.96 feet to a point;

Thence N 24° 33' 42" E, a distance of 35.70 feet to a point;

Thence S 65° 38' 55" E, a distance of 376.75 feet to a point;

Thence S 68° 35' 36" E, a distance of 256.66 feet to a point, said point being
on the westerly right-of-way line of Michigan Route 125;

Thence S 24° 14' 59" W, on and along the said westerly right-of-way line of
Michigan Route 125, a distance of 70.09 feet and returning to the True Place
of Beginning and enclosing an area of 2.1461 acres of land.

Bearings are based on a record bearing of the centerline of Michigan Route 125.
This legal description is not an actual survey but is based on a survey as
performed by Poggemeyer Design Group, Inc. for the Dayton-Hudson Corporation on
August 5 of 1993.

The Cafaro Company

Prepared by:  Allison M. H. Carmichael

Approved by:  David M. DeChristofaro, P.E.
              Professional Engineer, Ohio #48741
              Professional Surveyor, Ohio #7490
File No. 21
                              Page 2 of 2

                         EXHIBIT "E"



EXHIBIT E-1

March 11, 1994

State of Michigan
County of Monroe
Township of Frenchtown

LIBER 1396 PAGE 1020

FRENCHTOWN SQUARE

**LEGAL DESCRIPTION**

Perpetual Easement Two Over Access Road

Situated in the State of Michigan, County of Monroe, Township of Frenchtown, and being part of Private Claims No. 65 and 353 of the Northwest and Northeast Quarters of Section 29 and the Southwest Quarter of Section 20, Township 6 South, Range 9 East, and more fully described as follows:

Commencing for reference at a point at the intersection of the north line of Beverly Park Subdivision (Plat Volume 7, Page 36) extended and the centerline of Michigan Route 125;

Thence N 24° 15' 00" E, along the centerline of said Michigan Route 125, a distance of 1876.70 feet to a point;

Thence N 64° 07' 54" W, and leaving the centerline of said Michigan Route 125, a distance of 60.02 feet to a found iron bar in the northerly line of a parcel of land now or formerly owned by Victor Bellestri (Liber 868, Page 212), said iron bar also being on the westerly right-of-way line of Michigan Route 125;

Thence on and along the westerly right-of-way line of said Michigan Route 125, N 24° 15' 00" E, a distance of 78.38 feet to a point;

Thence N 68° 35' 36" W, and leaving the westerly right-of-way line of said Michigan Route 125, a distance of 254.98 feet to a point;

Thence N 65° 38' 55" W, a distance of 325.19 feet to a point;

Thence S 68° 51' 28" W, a distance of 20.12 feet to a point;

Thence N 65° 46' 25" W, a distance of 9.28 feet to a point;

Thence S 24° 13' 35" W, a distance of 394.22 feet to a point, said point being the P.C. of a curve the right;

Thence along the arc of a curve to the right, a distance of 94.25 feet to the P.T. of said curve, said curve having a radius of 60.00 feet and a central angle of 90° 00' 00";

Thence N 65° 46' 25" W, a distance of 581.71 feet to a point, said point being the P.C. of a curve to the right;

Thence along the arc of a curve to the right, a distance of 78.54 feet to the P.T. of said curve, said curve having a radius of 50.00 feet and a central angle of 90° 00' 00";

Page 1 of 3

EXHIBIT E-1

Perpetual Easement Two Over Access Road
Frenchtown Square
Legal Description

(IBER 1396 PAGE 1021

March 11, 1994

Thence N 24° 13' 35" E, a distance of 230.01 feet to a point, said point being the P.C. of a curve to the left;

Thence along the arc of a curve to the left, a distance of 59.76 feet to the P.O.C. of said curve, said curve having a radius of 50.00 feet and a central angle of 68° 28' 38", said P.O.C. being the **TRUE PLACE OF BEGINNING** for the herein described parcel of land;

Thence continuing along the arc of said curve to the left, a distance of 18.78 feet to the P.T. of said curve, said curve have a radius of 50.00 feet and a central angle of 21° 31' 22";

Thence N 65° 46' 25" W, a distance of 342.40 feet to the P.C. of a curve to the right;

Thence along the arc of a curve to the right, a distance of 109.96 feet to the P.T. of said curve, said curve having a radius of 70.00 feet and a central angle of 90° 00' 00";

Thence N 24° 13' 35" E, a distance of 552.50 feet to the P.C. of a reverse curve with the first curve bearing to the left;

Thence along the arc of a curve to the left, a distance of 183.26 feet to the P.R.C. of said curve, said curve having a radius of 210.00 feet and a central angle of 50° 00' 00";

Thence along the arc of a curve to the right, a distance of 92.91 feet to the P.T. of said curve, said curve having a radius of 248.91 feet and a central angle of 21° 23' 10";

Thence N 04° 23' 15" W, a distance of 153.06 feet to a point on the southerly right-of-way line of Mall Road, as recorded in Liber 1214, page 643;

Thence N 85° 36' 45" E, along the southerly right-of-way line of said Mall Road, a distance of 30.00 feet to a point;

Thence S 04° 23' 15" E, and leaving the southerly right-of-way line of Mall Road, a distance of 153.06 feet to the P.C. of a reverse curve with the first curve bearing to the left;

Thence along the arc of a curve to the left, a distance of 81.71 feet to the P.R.C. of said curve, said curve having a radius of 218.91 feet and a central angle of 21° 23' 10";

Thence along the arc of a curve to the right, a distance of 209.44 feet to the P.T. of said curve, said curve having a radius of 240.00 feet and a central angle of 50° 00' 00";

Page 2 of 3

EXHIBIT E-1

Perpetual Easement Two Over Access Road    LIBER 1396 PAGE 1022    March 11, 1994
Frenchtown Square
Legal Description

Thence S 24° 13' 35" W, a distance of 552.50 feet to the P.C. of a curve to the left;

Thence along the arc of a curve to the left, a distance of 62.83 feet to the P.T. of said curve, said curve having a radius of 40.00 feet and a central angle of 90° 00' 00";

Thence S 65° 46' 25" E, a distance of 360.69 feet to a point;

Thence S 24° 08' 12" W, a distance of 33.49 feet and returning to the True Place of Beginning and enclosing an area of 0.9897 acres of land, more or less.

Bearings are based on a record bearing of the centerline of Michigan Route 125. This legal description is not an actual survey but is based on a survey as performed by Poggemeyer Design Group, Inc. for the Dayton-Hudson Corporation on August 5 of 1993.

French Square Partnership

Prepared by:  Allison M. H. Carmichael

Approved by:  David M. DeChristofaro, P.E., P.S.
              Professional Engineer, Ohio #46711
              Professional Surveyor, Ohio #7490

File No. 21

3/17/94

Page 3 of 3

EXHIBIT E-1

LIBER 1396 PAGE 1023

EXHIBIT "F"

## TARGETS PARCEL AS PREPARED BY POGGEMEYER DESIGN GROUP, INC.

Drawing No. 1 - Boundary Survey, dated 9-9-93.
Drawing No. 2 - Amended Site Plan, dated 9-14-93.
Drawing No. 3 - Existing Topographic Plan, dated 7-21-93.
Drawing No. 4 - Site Dimension and Utility Plans, dated 9-15-93.
Drawing No. 5 - Site Grading and Landscape Plan, dated 9-14-93.
Drawing No. 6 - Water Details, dated 9-92.
Drawing No. 7 - Details and Legal Descriptions, dated 9-14-93.
Drawing No. 8 - Site Lighting Plan, no date.

## GENERAL SITE DRAWINGS FOR MALL AS PREPARED BY POGGEMEYER DESIGN GROUP, INC.

Drawing No. 1 - Existing Building and Utilities, dated 12-19-86.
Drawing No. 2 - Topographic Plan for Frenchtown Square Mall, dated 12-21-86.
Drawing No. 3 - Site Dimension Plan, dated 8-28-87.
Drawing No. 4 - Site Grading Plan, dated 9-24-87.
Drawing No. 5 - Soil Erosion Control Plan, dated 12-30-87.
Drawing No. 6 - Composite Utility Plan, dated 8-28-87.
Drawing No. 7 - Storm Sewer Plan, dated 8-28-87.
Drawing No. 8 - Sanitary Sewer Plan, dated 8-17-87.
Drawing No. 9 - Water Line Plan, dated 7-13-87.
Drawing No. 10 - Telephone, Electric and Gas Line Plan, dated 9-2-87.
Drawing No. 11 - Storm Sewer Profile, dated 7-2-87.
Drawing No. 12 - Storm and Sanitary Sewer Profiles, dated 8-17-87.
Drawing No. 13 - Sanitary Sewer and Water Line Profiles, dated 6-18-87.
Drawing No. 14 - Storm Sewer and Water Line Profiles, dated 6-18-87.
Drawing No. 15 - Pavement Details and Cross Sections, dated 2-2-87.
Drawing No. 16 - Storm Details, dated 7-2-87.
Drawing No. 17 - Water Details, City of Monroe, dated 6-20-85.
Drawing No. 18 - Sanitary Details, City of Monroe, dated 6-20-85.

EXHIBIT "F"

Page 1 of 2

DBP 1396 PAGE 1024

## J.C. PENNEY SITE AS PREPARED BY POGGEMEYER DESIGN GROUP, INC.

Drawing No. 1 - Existing Topography, dated 3-18-88.
Drawing No. 2 - Composite Utility Plan, dated 2-16-89.
Drawing No. 2A - Large Scale Composite Utility Plan, dated 9-11-88.
Drawing No. 3 - Grading and Soil Erosion Control Plan, dated 9-1-88.
Drawing No. 3A - Large Scale Grading Plan, dated 9-1-88.
Drawing No. 4 - Utility Profiles, dated 4-27-88.
Drawing No. 5 - Storm Details, dated 4-22-88.
Drawing No. 6 - Pavement Details and Cross Sections, dated 2-2-87.
Drawing No. 7 - Sanitary Details, City of Monroe, dated 10-20-85.
Drawing No. 8 - Water Details, City of Monroe, dated 6-20-85.

## PHARMOR SITE DRAWINGS AS PREPARED BY POGGEMEYER DESIGN GROUP, INC.

Drawing No. 2 - Topographic Plan, dated 3-27-89.
Drawing No. 3 - Additional Topographic Plan, no date.
Drawing No. 4 - Removal and Demolition Plan, dated 6-12-89.
Drawing No. 5 - Site Dimension Plan, dated 6-12-89.
Drawing No. 6 - Site Grading Plan, dated 8-28-89.
Drawing No. 7 - Soil Erosion Plan, dated 6-12-89.
Drawing No. 8 - Composite Utility Plan, dated 12-1-89.
Drawing No. 9 - Sanitary Sewer Plan, dated 12-1-89.
Drawing No. 10 - Storm Sewer Plan, dated 12-1-89.
Drawing No. 11 - Water Line Plan, dated 12-1-89.
Drawing No. 12 - Utility Profiles, dated 9-11-89.
Drawing No. 13 - Storm Details, dated 6-12-89.
Drawing No. 14 - Pavement Details and Cross Sections, dated 2-2-87.
Drawing No. 15 - Sanitary Details, City of Monroe, dated 7-21-77.
Drawing No. 16 - Water Line Details, dated 12-9-71.

EXHIBIT "F"

EXHIBIT "G"

LIBER 1396 PAGE 1025

**Unit 395: Phar-Mor** (Lease commenced 3/6/90, terminates 3/31/2005, with 2, 6-year options)

## 23. Fire or Other Casualty

A.  Should the Demised Premises (or any part thereof) be damaged or destroyed by fire or other casualty, Landlord shall, except as otherwise provided herein, repair and/or rebuild the same with reasonable diligence.  Landlord shall not be obligated to repair, rebuild or replace any property belonging to Tenant or any improvements to the Demised Premises furnished by Tenant.  Unless this Lease is terminated as hereinafter provided, Tenant shall, at its cost and expense, repair, restore, redecorate and refixture the Demised Premises and restock the contents thereof in a manner and to at least a condition equal to that existing prior to such damage or destruction, except for the building and improvements to be reconstructed by Landlord as above set forth.  In the event the Demised Premises are completely or partially destroyed or so damaged by fire or other casualty and this Lease is not terminated as hereinafter provided, there shall be an abatement of Minimum Rent and other charges payable under the terms of this Lease from the date of such damage or destruction until forty-five (45) days after Landlord completes its construction obligations under the terms of this paragraph or whenever the Tenant reopens for business, whichever first occurs.  If Landlord does not commence the repair and restoration work required pursuant to this section within sixty (60) days after the date of such damage or destruction, or the Demised Premises are not restored by Landlord in accordance with all of the provisions of this section within a period of nine (9) months after the date of such damage or destruction, Tenant shall have the right, at its sole discretion and option, to terminate this Lease by thirty (30) days' written notice to Landlord without waiving Tenant's rights to damages for Landlord's failure to perform its covenants and obligations hereunder.  The rights granted to Tenant herein shall be in furtherance and not in limitation of any other rights Tenant may have pursuant to this Lease.

B.  Notwithstanding anything to the contrary contained in the preceding Section A or elsewhere in this Lease, Landlord at its option may terminate this Lease on thirty (30) days' notice to Tenant, given within ninety (90) days after the occurrence of any damage or destruction if the Demised Premises be damaged or destroyed as a result of a risk which is not covered by standard fire and extended coverage insurance.

C.  If the Demised Premises are substantially destroyed by fire or other causes during the last two (2) years of the term of this Lease to the extent of more than one-third (1/3) of the gross leasable area thereof, as determined by a registered architect or engineer acceptable to both Landlord and Tenant, either Landlord or Tenant shall have the right to terminate this Lease as of the date of such damage or destruction by giving written notice within thirty (30) days following such damage or destruction, unless Tenant shall agree to extend the term of this Lease for an additional six (6) year period by exercising an option pursuant to Clause 42 of this Lease, if one is available.

EXHIBIT "G"

Page 1 of 8

LIBER 1396 PAGE 1026

Unit 395:  Phar-Mor (cont.)

D.  In the event the building in which the Demised Premises are situated, or other Shopping Center buildings, or the parking area or other Common Areas adjunct thereto are destroyed or so damaged by fire or other casualty so as to render more than twenty percent (20%) thereof unusable, notwithstanding the fact that the Demised Premises are not so damaged, Landlord shall advise the Tenant in writing within thirty (30) days after the happening of such fire or other casualty whether or not it intends to restore the buildings and/or parking areas so damaged or destroyed. Should the Landlord elect to restore, it shall commence such restoration promptly and diligently prosecute same to completion.  In the event Landlord elects not to restore, the Landlord or Tenant may terminate this Lease by giving the other party written registered notice of its intention to do so.  In the event neither party gives such notice, this Lease shall continue in full force and effect.

E.  All rebuilding, altering and repairing of the Demised Premises shall result in a center substantially similar to the Shopping Center prior to such destruction.

Unit 200:  Elder-Beerman  (Lease commenced 4/13/88, terminates 1/31/2008, with 4, 5-year options)

SECTION 22  DAMAGE.

(a)  Should the Demised Premises (or any part thereof) be damaged or destroyed by fire or other casualty insured under the standard fire and casualty insurance policy with approved standard extended coverage endorsement applicable to the Demised Premises, Landlord shall, except as otherwise provided herein, and to the extent it recovers proceeds from such insurance, repair and/or rebuild the same within one (1) year from the date of such damage or destruction.  Landlord's obligation hereunder shall be limited to the building and improvements originally provided by Landlord when the Demised Premises were originally constructed.  Landlord shall not be obligated to repair, rebuild or replace any property belonging to Tenant or any improvements to the Demised Premises furnished by Tenant.  Unless this Lease is terminated by Landlord as hereinafter provided, Tenant shall, at its cost and expense, repair, restore, redecorate and refixture the Demised Premises and restock the contents thereof in a manner and to at least a condition equal to that existing prior to such damage or destruction, except for the building and improvements to be reconstructed by Landlord as above set forth, and the proceeds of all insurance carried by Tenant on the property, decorations and improvements as well as fixtures and contents in the Demised Premises shall be held in trust by Tenant for such purposes.  In the event the Demised Premises are completely or partially destroyed or so damaged by fire or other casualty and this Lease is not terminated as hereinafter provided, there shall be no

EXHIBIT "G"

Page 2 of 8

Unit 200:  Elder-Beerman (cont.)          LIBER 1396 PAGE 1027

abatement of rent; it being understood and agreed that the Tenant shall, at its sole discretion, cost and expense, procure necessary insurance to protect itself against any interruption of its business. In the event Landlord does not complete the rebuilding of the Demised Premises within one (1) year from the date of such damage, Tenant may cancel and terminate this Lease by giving Landlord thirty (30) days prior written notice of its intention to do so. Said cancellation notice will be effective thirty (30) days after receipt thereof by Landlord.

(b)  Notwithstanding anything to the contrary contained in the preceding Section (a) or elsewhere in this Lease, Landlord at its option may terminate this Lease on thirty (30) days' notice to Tenant, given within ninety (90) days after the occurrence of any damage or destruction if (1) the Demised Premises be damaged or destroyed as a result of a risk which is not covered by Landlord's insurance; or (2) the Demised Premises be damaged during the last three (3) years of the term; or (3) the building of which the Demised Premises are a part shall be damaged to the extent of fifty (50%) or more of the then monetary value thereof (whether the Demised Premises be damaged or not); or (4) if any or all of the buildings or Common Areas of the Shopping Center are damaged (whether or not the Demised Premises are damaged) to such an extent that, in the sole judgment of Landlord, the Shopping Center cannot be operated as an integral unit. In the event Landlord notifies Tenant that it is cancelling this Lease under the provisions of item (2) above, Tenant shall have the right to negate said cancellation privilege by exercising its options, if available, under the terms of the Lease (equal or greater in length to ten (10) years or more), by notifying Landlord within thirty (30) days of the receipt of Landlord's notice to cancel that it is exercising said options.

(c)  Notwithstanding any language to the contrary contained in the preceding Section (a) or elsewhere in this Lease, Tenant, at its option, may terminate this Lease on thirty (30) days notice to Landlord given within ninety (90) days after the occurrence of any damage or destruction if the Demised Premises be substantially damaged to the extent of fifty percent (50%) or more during the last three (3) years of the lease term.

(d)  Except to the extent specifically provided for in this Lease, none of the Tenant's obligations under any provisions of this Lease shall be affected by any damage to or destruction of the Demised Premises by any cause whatsoever.

Unit 300:  Sears  (Lease commenced 4/30/88, terminates 4/30/2003, with 3, 5-year options)

15.  Damage or Destruction to Demised Premises
(a)  If the Demised Premises is damaged or rendered unfit for its accustomed use, either in part or totally, by fire, or any casualty, during the first 10 years of the initial Term, Landlord will, at its expense, promptly restore it to substantially its condition immediately prior thereto.

EXHIBIT "G"

Page 3 of 8

 1396 PAGE 1028

<u>Unit 300:  Sears</u>  (cont.)

(b)  If the Demised Premises is partially destroyed or rendered partially unfit for its accustomed use by fire or other casualty, during the last 5 years of the initial Term, or at any time during any extension Term, Landlord will, at its expense, promptly restore it to substantially its condition immediately prior to the casualty.  Any damage or destruction to the improvements to the Demised Premises which can be repaired for less than 25% of the replacement cost of the building on the Demised Premises, will be considered partially destroyed.

(c)  If the Demised Premises is damaged, destroyed or rendered unfit for its accustomed use by fire or other casualty during the last 5 years of the initial Term or at any time during any extension Term, and the cost to Landlord of repairing or restoring the Demised Premises to its original condition exceeds 25% of the replacement cost of the building on the Demised Premises, and if Landlord or Tenant desires to cancel this Lease, then Landlord or Tenant shall within 60 days of the casualty, by written Notice to Tenant or Landlord, advise Tenant or Landlord, of Landlord's or Tenant's, desire to cancel this Lease.  Landlord will have the right to cancel this Lease unless Tenant, within 30 days of receipt of the Notice, exercises a 5-year option pursuant to the provisions of Part I, Section 3 hereof.  If Tenant exercises an option or if Landlord does not advise Tenant of its desire to cancel this Lease pursuant to the provisions of this Section, Landlord will, at its expense, promptly restore the Demised Premises to substantially its condition immediately prior to the fire or casualty.  Notwithstanding the provisions of this subsection, Landlord will have the right to cancel this Lease within the 60-day period if no other Department Store is open and operating or will be open and operating after restoration (it being understood that the Department Store need not be obligated to operate).

(d)  If Landlord fails to repair or restore the Demised Premises as required in this Section, Tenant will have the right upon written Notice to Landlord, either to terminate this Lease or to repair and restore the Demised Premises, and Landlord will pay to Tenant, upon demand, Tenant's expense incurred in so repairing or restoring the Demised Premises, plus interest thereon at the prime rate of Chase Manhattan Bank.  If Tenant does not receive such payment from Landlord within 20 days of its demand, Tenant will have the right to deduct the same from any installments of Percentage Rent payable until reimbursed in full.

(e)  If the Demised Premises is partially or totally destroyed by fire or other casualty or rendered totally or partially unfit for its accustomed use by fire or other casualty, then until the Demised Premises is restored and repaired or this Lease is cancelled, the monthly Fixed Rent will be reduced in proportion to the percentage of the building so damaged or destroyed during each month of the period.

<u>EXHIBIT "G"</u>

Page 4 of 8

1396 1029

<u>Unit 300:   Sears</u>   (cont.)

Landlord shall be obligated to restore, under this Section 15, only if Tenant has operated for business at some time during the 30 day period prior to such fire or other casualty, unless Tenant has ceased to operate during the said 30 day period due to a default by Landlord under the terms of this Lease, in which event Landlord shall still have the obligation to restore.

16.  <u>Damage or Destruction to the Entire Tract</u>
          (a)  In the event of the destruction or damage of the buildings or other improvements on the Entire Tract or any part thereof during years 1 through 10 of Tenant's Term, and as often as any of these buildings or improvements during this period are destroyed or damaged by fire or other casualty, Landlord will rebuild and repair or replace all store buildings leased and occupied at the time of the casualty in question as well as the Common Areas, so that there will be on the Entire Tract an enclosed, air-conditioned mall and other improvements constituting an architecturally complete unit.

          (b)  During years 11 through 15 and any extension terms, in the event of destruction or damage to the buildings or other improvements on the Entire Tract or any part thereof where the cost to Landlord of repairing or restoring the Entire Tract to its original condition is less than 10% of the replacement cost then the Landlord shall have the obligation to repair and restore the damage.  If the damage however exceeds 30% of the replacement cost Landlord shall have no obligation to rebuild and Landlord will have the right to elect not to rebuild or repair the damaged or destroyed improvements by giving written Notice to Tenant within 60 days of the casualty, of Landlord's election to Tenant.  However, in the event Landlord elects not to rebuild or repair, Tenant shall have a period of 120 days from receipt of the Notice from Landlord that Landlord has elected not to rebuild or repair, to cancel this Lease effective as of a date within 2 years after receipt of the Notice.  If however the damage to the Entire Tract exceeds 10% but is less than 30% of the replacement cost of all the buildings on the Entire Tract, Landlord will have the right to elect not to rebuild or repair the damaged or destroyed improvements by giving written Notice to Tenant within 60 days of the casualty, of Landlord's election to Tenant.  However, in the event Landlord elects not to rebuild or repair, Tenant shall have a period of 120 days from receipt of the Notice from Landlord that Landlord has elected not to rebuild or repair, to cancel this Lease effective at any specified date within 2 years after receipt of the Notice.  In the alternative, Tenant will have the right within the 120 day period, to require that Landlord rebuild and repair or replace all the store buildings leased and occupied at the time of the casualty and the Common Areas so that there will be on the Entire Tract an enclosed air-conditioned mall and other improvements constituting an architecturally complete unit on the meeting of the following two conditions:

          (1)  Tenant exercises a 5-year option, if any pursuant to the provisions of Part I, Section 3 hereof, by notifying Landlord in writing within the 120 day period; and

<u>EXHIBIT "G"</u>

Page 5 of 8

 

IBF? 1396 ?36? 1030

<u>Unit 300:  Sears</u>  (cont.)

(2)  Tenant and two (2) or more other Department Stores will be open and operating after the completion of restoration (the Department Stores need not be obligated to operate and Tenant shall not be obligated to operate).

(c)  Any building or other improvements which Landlord is required to rebuild or repair pursuant to this Lease will be rebuilt and ready for occupancy within 18 months from the time of the loss or destruction.  Work, repair or reconstruction when once started by Landlord will be carried through continuously to conclusion, but unavoidable delays will not be deemed as an interruption constituting default by Landlord.

(d)  Nothing contained in this Section will require Landlord to rebuild a Department Store building if Landlord is not required to do so under the terms of Landlord's lease with the Department Store.

(e)  Any mortgage renewals or replacements placed by Landlord on the Entire Tract, or any agreement otherwise extending or modifying them, will not be inconsistent with the provisions of this Section.

(f)  Landlord shall be obligated to restore under this Section 16, only if Tenant has operated for business at some time during the 30-day period prior to such destruction or damage, unless Tenant has ceased to operate during the said 30-day period due to a default by Landlord under the terms of this Lease, in which event Landlord shall still have the obligation to restore.

(g)  If any buildings are not required to be rebuilt pursuant to this Section, the properties will be cleared and left in a sightly condition and landscaped or paved for parking as would be appropriate.

---

<u>Unit 650:  J.C. Penney</u>   (Lease commenced 10/29/88, terminates 11/30/2003, with 4, 5-year options)

DAMAGE CLAUSE

A.  If the Demised Premises, the appurtenances thereto or the Common Facilities shall, previous to the beginning of the term hereof or during the term hereof, be damaged or destroyed by fire or other casualty or any cause whatsoever, either in whole or in part, Landlord shall forthwith remove any resulting debris and repair and/or rebuild the damaged or destroyed structures and other improvements, including any improvements or betterments made by Landlord or Tenant, in accordance with the plan pursuant to which such property was constructed.  Until such time as the Demised Premises and Common Facilities are repaired, rebuilt and put in good and tenantable order (provided damage or destruction to the Common Facilities, in Tenant's

<u>EXHIBIT "G"</u>

Page 6 of 8

LIBER 1396 PAGE 1031

<u>Unit 650:   J.C. Penney</u> (cont.)

judgment reasonably exercised, affects Tenant's
operation), the rents hereby reserved, or a fair and
just proportion thereof according to the nature and
extent of the damage sustained, shall be abated; and if
Tenant shall be paying contingent rent hereunder based
on the amount of Net Retail Sales made upon the Demised
Premises the annual sales volume figure(s) set forth in
the Rent Rider attached hereto used in computing such
rent shall be reduced for the Lease Year(s) involved
proportionately with the reduction in the annual fixed
rent for such year(s).  If Tenant shall have paid rent
in advance, Landlord shall immediately repay to Tenant
an amount equal to that portion of rent so paid in
advance, payment of which is abated.  If Landlord, for
any reason whatsoever (subject to Unavoidable Delays
resulting from adjustment of the claim by Landlord with
its insurance carrier), fails to commence such
restoration work within 90 days from the date when such
damage or destruction occurred or fails thereafter to
proceed diligently to complete such repair work and/or
rebuilding, Tenant, in addition to such other rights and
remedies as may be accorded Tenant by law, shall have
the right and option to terminate the term of this lease
by giving Landlord notice of Tenant's election so to do
at any time prior to the completion of such repairs or
rebuilding provided Landlord shall not then be actively
undertaking such restoration work, and upon such notice
being given the term of this lease shall automatically
terminate and end.  Anything herein to the contrary
notwithstanding, (i) if the Demised Premises should be
damaged or destroyed by fire or other cause to such an
extent that the cost of restoration would exceed 50% of
the amount it would have cost to replace the Demised
Premises in their entirety at the time such damage or
destruction took place, and (ii) if at the time of such
damage or destruction the term of this lease is
scheduled to expire within a period of five years,
either Landlord or Tenant shall have the right and
option to terminate the term of this lease by giving the
other party to this lease notice of such election within
60 days after such damage or destruction shall have
taken place, and if such notice is given the term of
this lease shall terminate as of the date Tenant vacates
the Demised Premises, which date shall be not later than
90 days after the giving of such notice; provided,
however, that Tenant shall have the right to nullify any
such notice of termination given by Landlord if at the
time such notice is given an option herein granted
Tenant to extend the term of this lease for an
additional period of five years or more remains
unexercised and Tenant shall exercise such option within
60 days after the receipt of such notice from Landlord,
in which event Landlord's notice of such termination
shall be of no force or effect and Landlord shall
perform the restoration and other work required of
Landlord under the terms of this Paragraph A.

B.  If during the term hereof the Enclosed Mall or
any of the other buildings located within the Entire
Premises shall be damaged or destroyed by fire or other
casualty or any cause whatsoever, either in whole or in

<u>EXHIBIT "G"</u>

 LIBER 1396 PAGE 1032

<u>Unit 650:   J.C. Penney</u> (cont.)

part. Landlord shall repair and/or rebuild the same
promptly provided, however, that Landlord shall not be
obligated to rebuild any such Building to more than 75%
of its pre-existing Floor Area.   If Landlord shall fail
to commence such restoration work within six months
after the date when such damage or destruction occurred
or fail thereafter to proceed diligently to complete
such repair work and/or rebuilding, Tenant, in addition
to such other rights and remedies as may be accorded
Tenant by law, shall have the right and option to
terminate the term of this lease by giving Landlord
notice of Tenant's election so to do at any time prior
to completion of such repairs or rebuilding provided
Landlord shall not then be actively undertaking such
restoration work, and upon such notice being given the
term of this lease shall automatically terminate and end.

<u>EXHIBIT "G"</u>

Page 8 of 8

LIBER 1396 PAGE 1033

EXHIBIT "H"

SIGN CRITERIA

1.      There shall be no flashing, rotating, exposed light or
moving signs or markers of any type.

2.      There shall be no signs painted on the exterior surface of
any building except rear service door identification signs.

3.      There shall be no free-standing or pylon signs other than as
provided in Section 5.3 of this OEA captioned "Signs".

4.      All signs of Mall Store Buildings which front on the
enclosed mall shall be (i) not more than four feet (4') in
height, (ii) approximately flush with the wall of the
building to which affixed, (iii) of a length which does not
exceed 80% of the linear frontage of the store upon which it
fronts, and (iv) of a design which is uniform with other
signs similarly placed.

5.      Signs of Mall Store Buildings which are under building
canopies shall be (i) at right angles to the store front,
(ii) of a design which is uniform with other signs similarly
placed under building canopies, and (iii) not more than four
and one-half feet (4-1/2') wide and twelve inches (12")
high.

6.      There shall be no roof-top signs, except that signs affixed
to the sides of mechanical equipment penthouses on the
Target Building and any Major Store Building shall not be
considered roof-top signs.

7.      No signs will be permitted at the rear of any Mall Store
Buildings, except occupants of the Mall Store Buildings
having exterior customer entrances, occupants located
immediately adjacent to an enclosed mall entrance and each
Major Store Building may maintain signs displaying its name
only.

EXHIBIT "H"





LIBER 1396 PAGE 1042

RJR:sda 4/13/94

EXHIBIT X-1

## DOCUMENTS REQUIRING SIGNATURE

IDENTITY OF DOCUMENT: __Promissory Note, Option Agreement, Lease, OEA__

PROJECT NAME: __T- Monroe__                    LOCATION:_____

The attached document is submitted at the request of:

                    __Dave Cassman__
                    Title: Reg. Real Estate Mgr.
Purpose of this document is: to allow Target to purchase 9.9 acres of property for
the purchase price of $3,150,000.00. (Allocation: $2,835,000.00 for the building,
$315,000.00 for the land and existing site improvements.)  $10,000.00 deposit
required.  Option term continues until July 31, 1996.


APPROVED BY:          _____    __Bill Hise__
                                 Legal Department

              7/12/94                                    
                                 Richard Summerlee, Manager
                                 Capital Investment Analysis


                      _____    _____
                                 Ed Bierman, Vice President
                                 Real Estate


                      _____    _____
                                 Bob McMahon, Sr. Vice President
                                 Property Development

EXECUTED BY:                     _____
                                 Title:


ATTESTED BY:                     _____
                                 Title:


Please forward the document to the next person addressed.  If you are the last
person listed, please return to me promptly after signing.  Thank you.

              Date: _7/12/94_     Name: _L. Miller_____

(14)

ATTACHMENT

**Exhibit 4**

RECEIVED: 06/30/2021 08:44 AM
**2021R17209**
RECORDED: 06/30/2021 09:18 AM
ANNAMARIE OSMENT
OFFICIAL SEAL OF
MONROE COUNTY, MI
PAGES: 3



STATE OF MICHIGAN
MONROE
06/30/2021
2021R17209

REAL ESTATE ★
TRANSFER TAX ★
1,287.00  CO ★
8,775.00  ST ★
TTX # I233491 ★

## Covenant Deed

**TARGET CORPORATION,** a Minnesota corporation, formerly known as Dayton Hudson Corporation, whose address is 1000 Nicollet Mall, TPN12, Minneapolis, Minnesota 55403 ("Grantor"), conveys, grants, bargains, remises, aliens, and confirms to **Richmond Main, LLC,** a Michigan limited liability company, whose address is 56684 Hartley Drive West, Shelby Township, MI  48326 ("Grantee"), the premises in the township of Frenchtown, County of Monroe, State of Michigan, described as:

### See Exhibit A attached hereto and made a part hereof

with all the tenements, hereditaments, and appurtenances to it, for One Million One Hundred Seventy Thousand and no/100ths Dollars ($1,170,000.00), subject to real estate taxes and installments of special assessments not yet due and payable, all matters of record, all matters that would be disclosed by an accurate survey of the Property, and all acts of Grantee.  Grantor covenants and agrees that Grantor has not previously done or committed or willingly suffered to be done or committed any act, matter, or thing that would cause the Property or any part thereof to be charged or encumbered in title, estate, or otherwise.

Grantor grants to Grantee the right to make divisions under section 108 of the Land Division Act, Act No 288 of the Public Acts of 1967, as amended. Grantor intends to transfer to Grantee the right to make all divisions, bonus divisions, and redivisions of the property that the Grantor may have under the act.

This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices that may generate noise, dust, odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

(Signature Page Follows)

MONROE COUNTY TREASURER
TAX CERTIFICATE # E - 4665
Date:05/13/2021 Clerk:GS

(Signature Page – Covenant Deed)

Dated: May 12, 2021

TARGET CORPORATION

By_____
Name: Michael Seaman
Title Senior Director Real Estate

STATE OF MINNESOTA ) 
                         ) ss. 
COUNTY OF HENNEPIN )

        The foregoing instrument was acknowledged before me this 6 day of May, 2021, by Michael Seaman, Senior Director Real Estate of Target Corporation, a Minnesota corporation, on behalf of the corporation.

_____
Notary Public

Drafted By:
Jude Hockley
Target Corporation
1000 Nicollet Mall, TPS3155
Minneapolis, MN 55403

LISA C. WELLS
Notary Public-Minnesota
My Commission Expires Jan 31, 2023

~~When Recorded Return To:~~
**Richmond Main, LLC**
56684 Hartley Drive West
Shelby Township, MI 48326

When Recorded Return To: (USA)
First American Title Insurance Company
National Commercial Services
121 South 8th Street, Suite 1250
Minneapolis, MN 55402
File No: NCS-0375443

Send Subsequent Tax Bills To:
**Richmond Main, LLC**
56684 Hartley Drive West
Shelby Township, MI 48326

Recording Fee:

Transfer Tax

**Exhibit A**
**Legal Description**

Situated in part of the Township of Frenchtown, County of Monroe, State of Michigan and being part of Private Claims No.65 and 353 of the Northwest and Northeast quarters of Section 29 and the Southwest quarter of Section 20, Township 6 South, Range 9 East, and more fully described as follows:

Commencing for reference at a point at the intersection of the North line of Beverly Park Subdivision (Plat Volume 7, Page36) extended and the centerline of Michigan Route 125; thence North 24 degrees 15 minutes 00 seconds East, 1876.70 feet on and along said centerline to a point; thence North 64 degrees 07 minutes 54 seconds West, 60.02 feet to a foundiron bar in the Northerly line of a parcel of land now or formerly owned by Victor Bellestri (Liber 868, Page 212); thence on and along the Westerly right-of-way line of said Michigan Route 125 North 24 degrees 15 minutes 00 seconds East,
78.38 feet to the true point of beginning, for the herein described parcel;

thence North 68 degrees 35 minutes 36 seconds West, 254.98 feet to a set iron rod;
thence North 65 degrees 38 minutes 55 seconds West, 325.19 feet to a set iron rod;
thence South 68 degrees 51 minutes 28 seconds West, 20.12 feet to a set iron rod;
thence South 23 degrees 51 minutes 28 seconds West, 521.51 feet to a found general land office monument, passing at 35.21 feet a found iron rod marking the Northerly corner of lands now or formerly owned by said Victor Bellestri;
thence North 62 degrees 07 minutes 30 seconds West, 281.96 feet to a found general land office monument;
thence North 62 degrees 18 minutes 27 seconds West, 276.23 feet to a found general land office monument;
thence North 64 degrees 54 minutes 25 seconds West, 178.35 feet to a set iron rod;
thence North 24 degrees 08 minutes 12 seconds East, 498.76 feet to a set railroad spike;thence South 65 degrees 46 minutes 25 seconds East 409.48 feet to a set railroad spike;
thence North 24 degrees 13 minutes 35 seconds East, 33.92 feet to a set railroad spike;
thence South 65 degrees 48 minutes 58 seconds East, 284.11 feet to a set iron rod;
thence North 24 degrees 33 minutes 42 seconds East, 35.70 feet to a set iron rod;
thence South 65 degrees 38 minutes 55 seconds East, 376.75 feet to a set iron rod;
thence South 68 degrees 35 minutes 36 seconds East, 256.66 feet to a set iron rod in the Westerly right-of-way of saidMichigan Route 125;
thence on and along said right-of-way line, South 24 degrees 15 minutes 00 seconds West, 70.09 feet to the place of beginning.

Tax Parcel No. 07-065-093-10

**Exhibit 5**

Monroe, MI/T0900

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that concurrently with the execution and delivery hereof, TARGET CORPORATION, a Minnesota corporation ("Seller") is conveying to RICHMOND MAIN, LLC, a Michigan limited liability company ("Purchaser"), by that certain Special Warranty Deed of even date herewith (the "Deed"), all of Seller's right, title and interest in the Target store building (the "Building") located on the real property located at 2121 North Monroe Street, Monroe, Michigan, and legally described on Exhibit A attached hereto (the "Real Estate").

NOW, THEREFORE, in consideration of the receipt of TEN DOLLARS ($10.00) and other good and valuable consideration, in hand paid by Purchaser to Seller, the receipt and sufficiency of which are hereby acknowledged by Seller, Seller does hereby quitclaim and convey unto Purchaser all of Seller's rights, if any, in any personal property, including tangible personal property, and fixtures located in the Building as of the date hereof (the "Personal Property").

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns, forever.

The Personal Property is hereby conveyed and quitclaimed and this Bill of Sale is made, and is accepted by Purchaser, on an "AS IS, WHERE IS" basis without covenants, representations or warranties of any kind, whether expressed or implied, and all warranties that might have existed or been applied under common law are hereby excluded, except that Seller represents and warrants to Buyer that Seller is the owner of said Personal Property and that the Personal Property is free of any monetary encumbrances.

This Bill of Sale shall inure to the benefit of and be binding upon the parties hereto, their successors and assigns.

IN WITNESS WHEREOF, Seller has caused this Quitclaim Bill of Sale to be executed as of _May 12_, 2021.

SELLER:

TARGET CORPORATION,
a Minnesota corporation

By: _____
Name: Michael Seaman
Title: Senior Director Real Estate

EXHIBIT A TO BILL OF SALE
LEGAL DESCRIPTION

Situated in part of the Township of Frenchtown, County of Monroe, State of Michigan and being part of Private Claims No.65 and 353 of the Northwest and Northeast quarters of Section 29 and the Southwest quarter of Section 20, Township 6 South, Range 9 East, and more fully described as follows:

Commencing for reference at a point at the intersection of the North line of Beverly Park Subdivision (Plat Volume 7, Page36) extended and the centerline of Michigan Route 125; thence North 24 degrees 15 minutes 00 seconds East, 1876.70 feet on and along said centerline to a point; thence North 64 degrees 07 minutes 54 seconds West, 60.02 feet to a foundiron bar in the Northerly line of a parcel of land now or formerly owned by Victor Bellestri (Liber 868, Page 212); thence on and along the Westerly right-of-way line of said Michigan Route 125 North 24 degrees 15 minutes 00 seconds East, 78.38 feet to the true point of beginning, for the herein described parcel;

thence North 68 degrees 35 minutes 36 seconds West, 254.98 feet to a set iron rod; thence North 65 degrees 38 minutes 55 seconds West, 325.19 feet to a set iron rod; thence South 68 degrees 51 minutes 28 seconds West, 20.12 feet to a set iron rod; thence South 23 degrees 51 minutes 28 seconds West, 521.51 feet to a found general land office monument, passing at 35.21 feet a found iron rod marking the Northerly corner of lands now or formerly owned by said Victor Bellestri; thence North 62 degrees 07 minutes 30 seconds West, 281.96 feet to a found general land office monument; thence North 62 degrees 18 minutes 27 seconds West, 276.23 feet to a found general land office monument; thence North 64 degrees 54 minutes 25 seconds West, 178.35 feet to a set iron rod; thence North 24 degrees 08 minutes 12 seconds East, 498.76 feet to a set railroad spike;thence South 65 degrees 46 minutes 25 seconds East 409.48 feet to a set railroad spike; thence North 24 degrees 13 minutes 35 seconds East, 33.92 feet to a set railroad spike; thence South 65 degrees 48 minutes 58 seconds East, 284.11 feet to a set iron rod; thence North 24 degrees 33 minutes 42 seconds East, 35.70 feet to a set iron rod; thence South 65 degrees 38 minutes 55 seconds East, 376.75 feet to a set iron rod; thence South 68 degrees 35 minutes 36 seconds East, 256.66 feet to a set iron rod in the Westerly right-of-way of saidMichigan Route 125; thence on and along said right-of-way line, South 24 degrees 15 minutes 00 seconds West, 70.09 feet to the place of beginning.

**Exhibit 6**

INOFFICIAL COPY

RECEIVED: 06/30/2021 08:44 AM
**2021R17210**
RECORDED: 06/30/2021 09:18 AM
ANNAMARIE OSMENT
OFFICIAL SEAL OF
MONROE COUNTY, MI
PAGES: 5

## ASSIGNMENT AND ASSUMPTION OF
## OPERATION AND EASEMENT AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION OF OPERATION AND EASEMENT AGREEMENT ("**Assignment and Assumption**") is made this _12th_ day of May, 2021 (the "**Effective Date**"), by and between TARGET CORPORATION, a Minnesota corporation ("**Assignor**"), and RICHMOND MAIN, LLC, a Michigan limited liability company ("**Assignee**").

### RECITALS:

A:      Assignor has conveyed that certain real property described on Exhibit A attached hereto and made a part hereof (the "**Target Tract**") as of the date hereof to Assignee.

B.      The Target Tract is subject to the terms and provisions of that certain Operation and Easement dated August 3, 1994, recorded in the office of the Register of Deeds for Monroe County, Michigan, on August 4, 1994, in Liber 1396, Page 09 (as it may be amended and supplemented, the "**OEA**");

C.      Assignor desires to assign, transfer and convey all of Assignor's right, title and interest in, to and under the OEA to Assignee upon the terms hereinafter set forth.

E.      Assignee accepts the assignment of the OEA, including any claims, causes of actions, or defenses stemming from or related to the OEA, and as such hereby forever releases and discharges Assignor from any further obligations and liabilities thereunder.

NOW, THEREFORE, in consideration of Assignor's conveyance of the Target Tract to Buyer and for no other consideration, the parties hereto do hereby agree as follows:

1.      From and after the Effective Date, Assignor hereby assigns, transfers and conveys to Assignee any and all of Assignor's right, title and interest in, to and under the OEA, including, without limitation, transfer of Approving Party status for the Target Tract, to have and to hold the same unto Assignee, its successors and assigns, subject to the terms, covenants and conditions contained in the OEA.

UNOFFICIAL COPY

same unto Assignee, its successors and assigns, subject to the terms, covenants and conditions contained in the OEA.

2.      This Assignment and Assumption shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

3.      This Assignment and Assumption may be executed in counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one instrument.

4.      The recitals to this Assignment and Assumption are hereby incorporated into and made a part of this agreement.

[signature pages follow]

**SIGNATURE PAGE TO**
**ASSIGNMENT AND ASSUMPTION OF**
**OPERATION AND EASEMENT AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption as of the date first above written.

ASSIGNEE:

RICHMOND MAIN, LLC
A Michigan limited liability company

By: _____
Name: _NATHIR HERMEZ_____
Title: _MEMBER_____

STATE OF                    )
                            ) ss.
COUNTY OF                   )

The foregoing instrument was sworn to and acknowledged before me this _10_ day of ____MAY_____, 2021, by _NATHIR HERMEZ_ the _MEMBER_____ of Richmond Main, LLC, a Michigan limited liability company, by and on behalf of the limited liability company.

_____
Notary Public

*Prepared by:*
Target Corporation
Attn: Jude Hockley
Law Department/TPS 3155
1000 Nicollet Mall
Minneapolis, MN 55403/T1173

*When Recorded Return to:*
First American Title Insurance Company
121 South Eighth Street, Suite 1250
Minneapolis, MN 55402
Attn: Jodean Fritz
1037543

# SIGNATURE PAGE TO
## ASSIGNMENT AND ASSUMPTION OF
## OPERATION AND EASEMENT AGREEMENT

IN WITNESS WHEREOF, the parties hereto have executed this Assignment and Assumption as of the date first above written.

ASSIGNOR:

TARGET CORPORATION,
a Minnesota corporation

By: _____
Name: Michael Seaman
Title: Senior Director Real Estate

STATE OF MINNESOTA )
                    ) ss.
COUNTY OF HENNEPIN  )

The foregoing instrument was sworn to and acknowledged before me this 6th day of May, 2021, by Michael Seaman, the Senior Director Real Estate of Target Corporation, a Minnesota corporation, by and on behalf of said corporation.

_____
Notary Public

LISA C. WELLS
Notary Public-Minnesota
My Commission Expires Jan 31, 2023

EXHIBIT A TO ASSIGNMENT AND ASSUMPTION
LEGAL DESCRIPTION

Situated in part of the Township of Frenchtown, County of Monroe, State of Michigan and being part of Private Claims No.65 and 353 of the Northwest and Northeast quarters of Section 29 and the Southwest quarter of Section 20, Township 6 South, Range 9 East, and more fully described as follows:

Commencing for reference at a point at the intersection of the North line of Beverly Park Subdivision (Plat Volume 7, Page36) extended and the centerline of Michigan Route 125; thence North 24 degrees 15 minutes 00 seconds East, 1876.70 feet on and along said centerline to a point; thence North 64 degrees 07 minutes 54 seconds West, 60.02 feet to a foundiron bar in the Northerly line of a parcel of land now or formerly owned by Victor Bellestri (Liber 868, Page 212); thence on and along the Westerly right-of-way line of said Michigan Route 125 North 24 degrees 15 minutes 00 seconds East,
78.38 feet to the true point of beginning, for the herein described parcel;

thence North 68 degrees 35 minutes 36 seconds West, 254.98 feet to a set iron rod;
thence North 65 degrees 38 minutes 55 seconds West, 325.19 feet to a set iron rod;
thence South 68 degrees 51 minutes 28 seconds West, 20.12 feet to a set iron rod;
thence South 23 degrees 51 minutes 28 seconds West, 521.51 feet to a found general land office monument, passing at 35.21 feet a found iron rod marking the Northerly corner of lands now or formerly owned by said Victor Bellestri;
thence North 62 degrees 07 minutes 30 seconds West, 281.96 feet to a found general land office monument;
thence North 62 degrees 18 minutes 27 seconds West, 276.23 feet to a found general land office monument;
thence North 64 degrees 54 minutes 25 seconds West, 178.35 feet to a set iron rod;
thence North 24 degrees 08 minutes 12 seconds East, 498.76 feet to a set railroad spike;thence South 65 degrees 46 minutes 25 seconds East 409.48 feet to a set railroad spike;
thence North 24 degrees 13 minutes 35 seconds East, 33.92 feet to a set railroad spike;
thence South 65 degrees 48 minutes 58 seconds East, 284.11 feet to a set iron rod;
thence North 24 degrees 33 minutes 42 seconds East, 35.70 feet to a set iron rod;
thence South 65 degrees 38 minutes 55 seconds East, 376.75 feet to a set iron rod;
thence South 68 degrees 35 minutes 36 seconds East, 256.66 feet to a set iron rod in the Westerly right-of-way of saidMichigan Route 125;
thence on and along said right-of-way line, South 24 degrees 15 minutes 00 seconds West, 70.09 feet to the place of beginning.

Tax Parcel No. 07-065-093-10

**Exhibit 7**

KAREN INFANTE ALLEN
TRUMBULL CO CLERK OF COURTS
2022 CV 00056 PJK
FILED: 10/11/2022 08:28 AM

# IN THE COURT OF COMMON PLEAS
## – GENERAL DIVISION –
### TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| **FRENCHTOWN SQUARE PARTNERSHIP** | ) | **CASE NO. 2022 CV 00056** |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **vs.** | ) | **JUDGE PETER J. KONTOS** |
| | ) | |
| **RICHMOND MAIN LLC** | ) | |
| | ) | |
| **Defendant** | ) | **JUDGMENT ENTRY** |

This matter is before the Court on the Defendant Richmond Main, LLC dba Quality Auto Parts' Motion to Dismiss Plaintiff's Complaint, which this Court converted to a Motion for Summary Judgment as the parties included extraneous materials in their briefs which the Court was not permitted to consider in a Motion to Dismiss. The Court has considered the Motion, the response, the reply, the evidence, and the applicable law.

On July 27, 1994 Dayton Hudson Corporation (hereinafter referred to as "Target") and Plaintiff Frenchtown Square partnership entered into an Operation Easement Agreement ("OEA") for a portion of the premises generally described as Frenchtown Square Mall in Monroe, Michigan. Target is and was a Minnesota corporation with its headquarters in Minnesota. There was no choice of venue or personal jurisdiction clause in the OEA.

On May 12, 2021 Defendant Richmond Main, LLC dba Quality Auto Parts ("Richmond") entered into an Assignment and Assumption of Operation and Easement

Agreement between Target and Richmond. The effect of the Assignment and Assumption Agreement was the transfer and conveyance of Target's rights and obligations under the OEA to Richmond.

Richmond is a Michigan LLC formed for the specific purpose of acquiring the assignment of the OEA from Target.  Richmond does not engage in any business within the state of Ohio.   Richmond claims it had no direct dealings with Plaintiff until after the assignment was executed and delivered.

The purpose of the OEA is for the reciprocal grant of ingress, egress, parking and utilities easements over Richmond Main and Plaintiff's adjoining parcels in Michigan. The only payments in terms of the OEA are for Richmond to pay certain common area maintenance ("CAM") charges to Plaintiff, and for the reimbursement of costs to cure any default under the OEA.  Richmond has never made any payment of the CAM charges to Plaintiff or other insurance payments as required under the OEM.

Richmond claims that it does not avail itself of the privileges and opportunities of doing business in Ohio and has not purposely availed itself of that right in Ohio regarding Frenchtown Square Mall. Richmond does admit that has communicated with representatives of Plaintiff regarding the removal of snow or cutting the grass, but asserts that all those activities were to occur in Michigan.  Richmond claims that this Court does not have personal jurisdiction over it and has filed this Motion to Dismiss pursuant to Civ. R. 12(B)(2).

In determining whether this Court has personal jurisdiction over an out of state Defendant, the court must first determine whether the defendant's conduct falls within

Ohio's long arm statute R.C. 2307.382 or Civil Rule 4.3. *Fraley v. Estate of Oeding,* 138 Ohio St. 3d 250, 252 (2014). If the conduct does fall within either of those, the court must then consider whether the assertion of jurisdiction over the nonresident defendant would deprive the defendant of due process of law under the Fourteenth amendment. *Id.* A Motion to Dismiss places the burden upon the plaintiff to show that the trial court has personal jurisdiction over the non-resident defendant. *Kauffman Racing Equip., LLC v. Roberts,* 126 Ohio St. 3d 81, 85 (2015).

R.C. 2307.382 provides that a Court may exercise personal jurisdiction over a person arising out of, inter alia, that person's transacting business in this state.[1] Civ. R. 4.3 mirrors the long arm statute and provides for service of process to be made upon a person outside of the State of Ohio when the claim arose from the person's transacting any business in this state.

Determining whether a nonresident is "transacting any business" in Ohio is a case-by-case evaluation. *United States Sprint Communications v. K's Foods,* 68 Ohio ST. 3d 181, 185 (1994). The term "transact" encompasses " 'to carry on business' "and" 'to have dealings,' " and is " 'broader * * * than the word "contract" '." *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.* (1990), 53 Ohio St.3d 73, 75, 559 N.E.2d 477. Personal jurisdiction does not require physical presence in the forum state. *Id.;* see, also, *Ucker v. Taylor* (1991), 72 Ohio App.3d 777, 780, 596 N.E.2d 507.

"Frequent mail and telephone communications between two companies in different states are considered commercial contacts and are not " 'purposefully directed' " to Ohio in a way that would lead the foreign corporation to realize that it could be

---

[1] The definition of person includes a corporation. R.C. 2307.011

haled into an Ohio court." *Huskin v. Pappse,* 2000 WL 895598 (11th Dist., 2000) citing *Friedman v. Speiser,* 56 Ohio App.3d 11, 14, 565 N.E.2d 607, (1988).

Plaintiff's complaint asserts that Article 4.2(C) of the OEA obligates Defendant to pay to Plaintiff in Ohio an annual Common Area Maintenance charge payable in monthly installments, on the first day of each month during the term of the OEA. Defendant never actually made any of the CAM payments required by the OEA.

Defendant asserts that as a Michigan Limited Liability Company, it was doing business in Michigan, involving Michigan real estate, and this Court has no personal jurisdiction over them. Richmond asserts that it had no other contacts with Ohio in this dispute beyond responding to Plaintiff's demands and hiring counsel, and had no contact in Ohio beyond phone calls, emails and mailings. Defendant further asserts that it does not engage in the sale of any goods or services in the State of Ohio.

Plaintiff asserts that, as long as it remains the owner of the Mall of Monroe and an Ohio resident, no one can be a good faith party to the OEA and not have at least monthly contacts in Ohio. Plaintiff cites to Article 6.4 of the OEA that required Target, and now by assignment Defendant Richmond, to provide "[a]ll notices, demands, statements and requests ("notice") required or permitted to be given under this OEA" to FSP in Ohio. Examples of required notices under the OEA include:

- Notice of changes or modification of the common area –Section 2.1(B)(iii)(e)
- Notice of closing off portions of the common area – Section 2.1(B)(iv)
- Notice of need for easements Section 2.2(A) and (B).
- Notice of change of address Section 6.4.

In addition to these notices, the OEA required Target, and now by assignment, Richmond to make certain payments to Plaintiff in Ohio, including payments for general liability insurance, the CAM fees, and interest on any past due sums.  Plaintiff asserts that Defendant Richmond is disingenuously using its intentional breaches of the OEA to avoid personal jurisdiction.

Plaintiff further detailed telephone and email communications between Richmond Main's Nathir Hermez and Plaintiff's representative Timothy Matune as proof of the contacts with Ohio. There were multiple negotiations prior to assumption of the OEA as well as contacts after the assumption.

Here, reviewing all the evidence presented, the Court finds that this Court may exercise personal jurisdiction over Defendant Richmond Main because Defendant was "transacting business" in Ohio.  As Plaintiff points out, the OEA is an active two-way contract, and Plaintiff's business office has always been in Ohio.  The phrase "transacting any business in this state" as contemplated in R.C. 2307.382 and Civ. R. 4.3(A)(1) has been given a broad interpretation and is meant to be applied in a liberal manner.  *Goldstein v. Christiansen,* 70 Ohio St. 3d 232, 236.  By accepting the assignment of the OEA with Plaintiff, Defendant was necessarily conducting business with Plaintiff.  Richmond may not use its own deliberate breaches of the OEA to avoid personal jurisdiction in Ohio.  In an analogous case, the Ohio Supreme Court has held that "[a] commercial nonresident lessee, for purposes of personal jurisdiction, is "transacting any business" within the plain and common meaning of the phrase, where the lessee negotiates, and through the course of dealing becomes obligated, to make

payments to its lessor in Ohio." *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear,* 53 Ohio ST. 3d 73, 76. Here the Defendant was obligated through the course of dealing to make payments to Plaintiff in Ohio.

Having determined that Defendant's conduct meets the requirements of R.C. 2307.382 and Civ. R. 4.3, the court must now consider whether the assertion of personal jurisdiction by an Ohio court over Defendant comports with the Due Process Clause of the Fourteenth Amendment. The Supreme Court of the United States considered personal jurisdiction in the context of due process considerations in the renowned case of *International Shoe Co. v. Washington,* 326 U.S.310, 66 S. Ct. 154 (1945). The International Shoe Court held that a state may assert personal jurisdiction over a nonresident defendant if the nonresident has " * * * certain minimum contacts with it such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " (Citation omitted.) Id. at 316, 66 S.Ct. at 158.

The Court finds that in assuming the OEM agreement and in the attendant negotiations, the Defendant purposefully established 'minimum contacts' in Ohio. By creating continuing obligations between itself and the Ohio resident Plaintiff, they have availed themselves of the privilege of doing business here, and it is not unreasonable to require them to submit to the burdens of litigation in this forum. See *Burger King v. Rudzewicz,* 471 U.S. 462, 105 S. Ct. 2174 (1985). The Court further finds that Defendant cannot use its own breach of the OEM as a shield to prevent a finding of personal jurisdiction in Ohio. Accordingly, after a thorough review of the pleadings and the evidence before us, this court finds that Defendant Richmond Main purposefully

directed activities toward an Ohio-based partnership so that it could reasonably anticipate being haled into an Ohio court.  The Court further finds that this assertion of personal jurisdiction over Defendant Richmond comports with fair play and substantial justice under the Due Process Clause of the Fourteenth Amendment.

Defendant's 12(B)(2) Motion to Dismiss for Lack of Personal Jurisdiction, converted to a Motion for Summary Judgment so that the Court could consider the extraneous materials, is DENIED.

Next, Defendant seeks to dismiss the case pursuant to Civ. R. 12(B)(6). A motion to dismiss for failure to state claim upon which relief can be granted is procedural and tests the sufficiency of the complaint." *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.* (1992), 65 Ohio St.3d 545, 548, 605 N.E.2d 378. "[I]t must appear beyond doubt from the complaint that the plaintiff can prove no set of facts entitling him to recovery." *O'Brien v. Univ. Community Tenants Union (1975), 42 Ohio St.2d 242, 327 N.E.2d 753*, syllabus. In considering a motion to dismiss for failure to state a claim, a trial court cannot consider matters beyond the pleadings. Civ. R. 12(B).  *Altier v. Valentic,* 11th Dist. No. 2003-G-2521, 2004 Ohio 5641.

Here, the Plaintiff has filed leave to file an amended complaint, which this Court has granted.  Therefore, the Motion to Dismiss for failure to state a claim is moot.

Defendant's Motion to Dismiss is hereby DENIED.

IT IS SO ORDERED.

JUDGE GARY L. YOST,
SITTING BY ASSIGNMENT

**TO THE CLERK OF COURTS:  You Are Ordered to Serve
Copies of this Judgment on all Counsel of Record
or Upon the Parties who are Unrepresented Forthwith
by Electronic Mail / Ordinary Mail.**

JUDGE GARY L. YOST,
SITTING BY ASSIGNMENT

**Exhibit 8**

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is executed by and between Frenchtown Square Partnership ("Frenchtown"), with a principal business office address of 5577 Youngstown-Warren Road, Niles, Ohio 44446, and Richmond Main, LLC, dba Quality Auto Parts ("Richmond Main"), with an address 56684 Hartley Dr. West, Shelby Township, Michigan 48236.

Frenchtown entered into an Operation and Easement Agreement ("OEA") with Dayton Hudson Corporation ("Target") on or about August 3, 1994, to set forth each Party's rights and responsibilities in developing and operating in certain premises now known as The Mall of Monroe in Monroe, Michigan. On or about May 12, 2021, Target assigned, transferred, and conveyed title to its Tract ("Target Tract") and all of its rights and responsibilities in the OEA to Richmond Main pursuant to an Assignment and Assumption of Operation and Easement Agreement ("Assignment"). Frenchtown filed a lawsuit on January 14, 2022 against Richmond Main in the Trumbull County Court of Common Pleas, in Warren, Ohio, Case No. 2022 CV 00056 ("Lawsuit") alleging Richmond Main was in default of the OEA for its a) failure to pay various charges owed under the OEA, including, amongst others, the Common Area Maintenance Charge ("CAM charge") and its share of the general liability insurance premium ("Insurance Charge"); and b) its failure to maintain condition of the premises in accordance with the terms and conditions of the OEA ("Default").

Frenchtown and Richmond Main hereby desire to compromise and adjust all claims and differences between them as they relate to the Default and the Lawsuit, upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants contained in this Agreement, the parties hereby agree as follows:

1.  All representations, statements, and conditions set forth in the preamble hereto are incorporated into this Agreement as though fully rewritten herein at length.

2.  In consideration of its receipt of $138,501.00 ("Settlement Payment"), Frenchtown agrees to waive all outstanding finance charges incurred under Section 6.2 of the OEA through November 1, 2022 ("Waived Charges") and accept the Settlement Payment as payment in full of all outstanding charges owed under the OEA through December 31, 2022 provided Richmond Main a) pays the Settlement Payment no later than November 1, 2022 and b) does not subsequently default under the terms and conditions of this Agreement or the OEA. Frenchtown acknowledges that it received the Settlement Payment on November 1, 2022.

3.  Richmond Main acknowledges and confirms that Frenchtown's calculation of charges under the OEA was correct. Commencing January 1, 2023, and thereafter, Richmond Main shall timely pay all moneys owed under the OEA to Frenchtown including, amongst others, the CAM Charge and the Insurance Charge.

4.  On or before June 1, 2023, Richmond Main shall, at its own cost and expense, complete each of the following repairs:

    a)  clean by power wash and seal the exterior of the building located on the Target Tract (former Target store) and its rear screen wall;

    b)  replace all STOP signs that are missing or faded on the Target Tract, and

    c)  replace missing covers protecting the electrical components on Target Tract

parking light poles.

5.    On or before October 1, 2023, Richmond Main shall, at its own cost and expense, complete each of the following:

        a)    repair the concrete curbs on the islands in front of the Target Tract building;

        b)    mill down, remove and replace the asphalt in the Target Tract parking areas and cruise lanes only in areas that require replacement. The parties agree to meet at the Target Tract after the winter weather has subsided (approximately March-April 2023)("Spring Meeting") for an inspection of the asphalt to determine which areas of the Tract need mill down and repair, and which areas need sealing. The parties agree to make all such determinations in good faith. In the event there is a dispute as to such determinations, Richmond Main agrees to hire a third party contractor or engineer selected by Frenchtown, at Richmond Main's expense, to make a binding determination in this particular situation so that the asphalt will be brought in compliance with the terms, covenants and conditions of the OEA.

6.    For all repairs listed in Paragraph Nos. 4 and 5 above, Richmond Main shall exclusively use contractors approved in advance by Frenchtown.  With regard to milling down, removing and replacing the Target Tract asphalt, once the upcoming winter weather clears Frenchtown will review and assess the state of the asphalt, parking areas and cruise lanes, and provide Richmond Main with the specifications and scope of work that must be completed in order to cure this repair default. Said specifications and scope of work will be limited to only the areas that require said replacement as determined by the Parties at

the Spring Meeting.  With regard to curing all repair defaults, prior to hiring any contractor Richmond Main shall provide Frenchtown with written notice of the specifications, scope and cost of the work to be performed by the contractor at least thirty (30) days prior to the date Richmond Main wishes the work to commence.   Richmond Main understands and agrees that Frenchtown must approve the quality and scope of all work before any contract is executed and before any work begins.

7.      Within seven (7) business days after the mutual execution of this Agreement, Frenchtown will file a Notice of Voluntary Dismissal Without Prejudice of the Lawsuit.

8.      Neither the filing of a Notice of Voluntary Dismissal Without Prejudice to dismiss this Lawsuit nor the entry of this Agreement shall be construed as a release or waiver of any claims held by Frenchtown.  Should Richmond Main breach or become in default of this Agreement or the OEA, then Frenchtown reserves the right to pursue the claims and defaults raised in the Lawsuit, including, but not limited to the Waived Charges, along with any new claims or defaults.  Richmond Main waives any and all objections and defenses to the refiling of the Lawsuit, including, but not limited to, all matters of personal jurisdiction, venue, statutes of limitation, res judicata, accord and satisfaction and/or estoppel should Frenchtown chose to again pursue the claims and defaults raised in the Lawsuit.

9.      Richmond Main hereby releases and forever discharges Frenchtown, its employees, agents, successors, and assigns, from any and all claims, demands, damages, actions, and causes of action of any kind or nature whatsoever, whether said claims are known or unknown, contingent, or liquidated, from the beginning of time to the effective date of this

Agreement.

10.    Upon Richmond Main's timely completion of the repairs as set forth and agreed upon in
Paragraphs 4 and 5, Frenchtown hereby releases and forever discharges Richmond Main
and its employees, agents, successors and assigns, from any and all claims, demands,
damages, actions and causes of action of any kind in nature whatsoever, whether said
claims are known or unknown, contingent, or liquidated, from the beginning of time until
the effective date of this Agreement provided Richmond Main is not in default of this
Agreement or the OEA.  Nothing in this Agreement releases Richmond Main from any
breaches or defaults it may commit of this Agreement, and subsequent breaches or defaults
it may commit of the OEA after the effective date of this Agreement.

11.    Nothing in this Agreement releases Richmond Main from any obligation to hold harmless,
indemnify, and defend Frenchtown and/or its affiliates from and against any and all claims,
demands, actions and causes of action, whether known or unknown, by any third parties
arising out the OEA or obligations which accrued as a result of the OEA.

12.    Nothing in this Agreement releases Frenchtown from any obligation to hold harmless,
indemnify, and defend Richmond Main and/or its affiliates from and against any and all
claims, demands, actions and causes of action, whether known or unknown, by any third
parties arising out the OEA or obligations which accrued as a result of the OEA.

13.    Richmond Main acknowledges that the payment made in Paragraph 2 herein is less than
the charges it would have paid Frenchtown through December 31, 2022.  Richmond Main
agrees that should it commence a proceeding for liquidation, reorganization, or adjustment
of debts in any court pursuant to any statute, either of the United States or any state, or if

such a proceeding is commenced against Richmond Main and Frenchtown does not retain the full amount of the payment identified in Paragraph No. 2 above, as a result thereof, then the damages of Frenchtown shall be calculated according to the provisions of the OEA prior to this Agreement, giving no effect to the provisions of this Agreement related to the settlement payment; in such instance, the portion of this Agreement related to the settlement payment shall be null and void as if never executed.

14.  This Agreement contains the entire agreement between the parties, and the terms hereof are contractual in nature and not merely a recital.

15.  The provisions of this Agreement shall be binding and inure to the benefit of the heirs, legal representatives, successors, and assigns of the parties hereto.  None of the terms, covenants and conditions of the OEA are modified or amended hereby, and all terms, covenants and conditions of the OEA shall remain in full force and effect and are hereby adopted and reaffirmed by the parties hereto.

16.  This Agreement shall become effective and binding on the date fully executed by all parties hereto and until such time, no parties hereto shall have any rights pursuant hereto or pursuant to any discussions or negotiations between the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement with the intent to be legally bound.

FRENCHTOWN SQUARE PARTNERSHIP

Witness

By: _____
Anthony M. Cafaro Jr., Authorized Agent

_____
Witness

STATE OF OHIO           )
                              ) SS:
COUNTY OF TRUMBULL   )

       Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Anthony M. Cafaro, Jr., known to me to be an Authorized Agent of FRENCHTOWN SQUARE PARTNERSHIP, the partnership which executed the foregoing document, who acknowledged that he did sign and seal the foregoing instrument for and on behalf of said partnership being thereunto authorized; that the same is his free act and deed as such agent and the free act and deed of said partnership.

       IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Niles, Ohio, this _23_ day of _January_, 2022.

> WILLIAM PATRICK GOODWIN
> Notary Public
> State of Ohio
> My Comm. Expires
> February 13, 2027

_____
Notary Public

RICHMOND MAIN, LLC

By: _____
     Nathir Hermez, President

_____
Witness

_____
Witness

STATE OF MICHIGAN    )
                         ) SS:
COUNTY OF MACOMB    )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Nathir Hermez, known to me to be the President of  RICHMOND MAIN, LLC, the limited liability company which executed the foregoing document, who acknowledged that he did sign and seal the foregoing instrument for and on behalf of said limited liability company being thereunto authorized by its members; that the same is his free act and deed as such agent and the free act and deed of said limited liability company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Shelby Township, Michigan, this _____ day of _____, 2022.

_____
Notary Public

_____
Witness

STATE OF OHIO            )
                         ) SS:
COUNTY OF TRUMBULL       )

     Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Anthony M. Cafaro, Jr., known to me to be an Authorized Agent of FRENCHTOWN SQUARE PARTNERSHIP, the partnership which executed the foregoing document, who acknowledged that he did sign and seal the foregoing instrument for and on behalf of said partnership being thereunto authorized; that the same is his free act and deed as such agent and the free act and deed of said partnership.

     IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Niles, Ohio, this 20th day of January 2022. 2023

PAULINE KALLO
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF MACOMB
My Commission Expires April 08, 2028
Acting in the County of Macomb

_____
Notary Public

RICHMOND MAIN, LLC

_____
Witness

By: _____
    Nathir Hermez, President

_____
Witness


STATE OF MICHIGAN       )
                        ) SS:
COUNTY OF MACOMB        )

Personally appeared before me, the undersigned, a Notary Public in and for said County and State, Nathir Hermez, known to me to be the President of RICHMOND MAIN, LLC, the limited liability company which executed the foregoing document, who acknowledged that he did sign and seal the foregoing instrument for and on behalf of said limited liability company being thereunto authorized by its members; that the same is his free act and deed as such agent and the free act and deed of said limited liability company.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal at Shelby Township, Michigan, this 20th day of January, 2022. 2023

_____
Notary Public

PAULINE KALLO
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF MACOMB
My Commission Expires April 08, 2028
Acting in the County of Macomb

**Exhibit 9**

KAREN INFANTE ALLEN
TRUMBULL CO CLERK OF COURTS
2022 CV 00056 CWR
FILED: 01/27/2023 09:48 AM

## IN THE COURT OF COMMON PLEAS
## TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| FRENCHTOWN SQUARE PARTNERSHIP | ) | CASE NO: 2022-CV-00056 |
| | ) | |
| Plaintiff, | ) | JUDGE: CYNTHIA RICE |
| | ) | |
| | ) | |
| vs. | ) | **NOTICE OF DISMISSAL** |
| | ) | **WITHOUT PREJUDICE** |
| RICHMOND MAIN, LLC | ) | |
| dba QUALITY AUTO PARTS | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff hereby gives notice to the Court that Plaintiff dismisses, without prejudice, its

Complaint against Defendant, Richmond Main, LLC.

Respectfully submitted,

/s/ Leonard D. Hall
Leonard D. Hall (0029539)
Michael J. Wright (0075221)
Attorneys for Plaintiff
5577 Youngstown Warren Road
Niles, Ohio 44446
Phone: (330) 747-2661
Fax: (330) 743-2902
LHall@cafarocompany.com
MWright@cafarocompany.com

**CERTIFICATE OF SERVICE**

A copy of this Notice of Dismissal Without Prejudice has been sent by e-mail and regular U.S. Mail on this 27th day of January 2023, to Defendant through counsel:

Stephen M. Bales (0003380)
Brian F. Kampman (0092386)
ZIEGLER METZGER LLP
111 Superior Avenue, Suite 1000
Cleveland, Ohio 44114-2568
E-mail:   sbales@zieglermetzger.com
          bkampman@zieglermetzger.com

&

Eric M. Nemeth
Varnum LLP
480 Pierce Street, Suite 300
Birmingham, Michigan 48009
E-mail:   emnemeth@varnumlaw.com

Attorneys for Defendant
Richmond Main, LLC dba Quality Auto Parts

/s/ Leonard D. Hall_____
Leonard D. Hall
Attorney for Plaintiff

**Exhibit 10**

# THE MONROE NEWS

BUSINESS

# Target to close Monroe store in January

**Alex Alusheff**

Published 11:01 p.m. ET Nov. 3, 2014 | Updated 9:59 p.m. ET Nov. 4, 2014

Target at Mall of Monroe will close on Jan. 31.

The Monroe store is one of 11 that Target Corporation will close across the country as of Feb. 1, according to a press release from Target.

The closures are part of the franchise's strategy to reduce costs after experiencing losses after hackers stole thousands of customers' credit card information earlier this year, said Joe Bell, director of corporate communications for Cafaro Co., the Youngstown, Ohio-based operator of the Mall of Monroe.

?We?re sorry to hear this and will certainly do what we must to support its operations until it closes,? Mr. Bell said. ?We have a longstanding relationship with Target and they?ve been our tenant for quite a while."

Target opened in the mall in 1994 and occupies 96,800 square feet in the mall.

It's lease at the mall is not close to expiring and Mr. Bell said it was supposed to continue well after 2015.

However, Target owns the space it occupies, allowing it a little more flexibility when it comes to operations of the store, Mr. Bell said.

It was originally believed that Target would close on Jan. 1, but it will remain open until the end of the month to coincide with the end of the Christmas holiday shopping season, Mr. Bell said.

In the meantime, Mr. Bell said both Cafaro and Target will be looking for tenants to fill the space.

"We already initiated talks with other retailers and there's always interest in space at the mall," he said.

National store closings include locations in Michigan, Indiana, Illinois, Iowa, Georgia, Kansas, Minnesota and Texas. Other closures in Michigan are in Southfield and Bay City.

**Exhibit 11**

**Your web browser (Safari 15.6) is out of date and unsupported.** You may experience issues when using this site. Please update your browser.

Update

| | |
|---|---|
| **Case ID** | **Court Location** |
| 1997-0000006953-CZ | 38th Circuit Court – Monroe |
| **Case Entitlement** | **Judge of Record** |
| FRENCHTOWN SQUARE PA V LARRY LOVE | LAVOY,WILLIAM F., |
| **Date Filed** | **Case Status** |
| 09/09/1997 | CLOSED |
| **Closed Date** | **Balance** |
| 02/25/1998 | |

## Parties (5)

| **Party Name** | **Party Type/Number** |
|---|---|
| FRENCHTOWN SQUARE PARTNER | PLAINTIFF – 1 |

| | |
|---|---|
| **Attorney Name** | **Alternate Name(s)** |
| RICHARD A. ROBLE | |
| **Answer Date** | **Service Date** |
| **Disposition** | **Disposition Date** |

**Exhibit 12**



***SEPTEMBER 1, 2022***---"PROPOSED ORDER TEMPLATE" HAS BEEN UPDATED AND IS REQUIRED WHEN FILING ELECTRONICALLY PURSUANT TO LOC. R. 11.

E-FILING FOR ALL CIVIL (NEW CASES AND SUBSEQUENT PLEADINGS) WILL BE MANDATORY EFFECTIVE TUESDAY, SEPTEMBER 1, 2020.  PRO-SE LITIGANTS ARE TO CONTACT THE CLERK OF COURTS OFFICE AT (330) 675-2557 FOR FURTHER INSTRUCTION.

**Important Notice about eAccess**

The **Trumbull County Common Pleas Court's** computer record information disclosed by the system is current and is believed to be as accurate only with the limitations of the Court data retrieval system.  All users of this system agree to hold the Court and its Employees harmless from any and all claims, demands, obligations, action, cause of action, suits, fees, or liabilities, directly or indirectly relating to this service. In no event shall the Court have liability for lost profits or for indirect, special, punitive or consequential damages or any liability to any third party, even if the Court is advised of the possibility of such damages. The use of this service to engage in any activity that constitutes violation of local, state, and/or federal laws is strictly prohibited.
*If any person notices errors or omissions*, please contact the Trumbull County Common Pleas Court by telephone at **Phone: (330) 675-2557.**
<u>**Law enforcement officers are cautioned**</u> that any warrant information displayed must be verified by the clerk in person as to the accuracy **before any official action is taken.** Failure to do so may result in adverse administration or court action. Any misuse of the information obtained from the web site is the sole responsibility of the user. Be advised that the use of the information must be in full compliance with all laws, rules, and regulations of the State of Ohio, The Ohio Supreme Court, The Trumbull County Common Pleas Court, and the United States of America.  Any violations will subject the user to criminal, and/or civil sanctions.  By entering this site and conducting a search, you, the user, accept these terms and conditions and accept all responsibility for any misuse of the information it contains and that may result in the administrating of mental or physical harm to any person(s).

*Compatitibility:*
Internet Explorer Version 11 or later
Google Chrome Version 43 or later
Mozilla Firefox Version 32 or later

 To search Trumbull County Common Pleas public records.
Note: If you have questions or comments contact Barb, Computer Systems Administrator, at 330-675-3050.

# Search Results

## Name Search⏷

Showing 1 to 11 of 11
<< < 1 > >>

| Case Number | Case Type | File Date | Initiating Action | Party/Company | Party Type | Date of Birth | Case Status | Affiliation |
|---|---|---|---|---|---|---|---|---|
| 2016 CV 01059 | CV - Civil | 06/17/2016 | OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2017 CV 00117 | CV - Civil | 01/20/2017 | OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2019 CV 00986 | CV - Civil | 06/14/2019 | OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2020 CV 01057 | CV - Civil | 09/15/2020 | E-OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2020 CV 01394 | CV - Civil | 12/17/2020 | E-OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2020 TR 00038 | TR - Court of Appeals | 06/30/2020 | NOTICE OF APPEAL-11TH DIST. APPELLATE COURT | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2021 CV 01303 | CV - Civil | 11/18/2021 | E-OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2023 CV 01531 | CV - Civil | 10/11/2023 | E-OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2023 CV 01771 | CV - Civil | 11/30/2023 | E-OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | CLOSED | |
| 2024 CV 00199 | CV - Civil | 02/05/2024 | E-OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | OPEN | |
| 2024 CV 00970 | CV - Civil | 06/14/2024 | E-OTHER CIVIL | FRENCHTOWN SQUARE PARTNERSHIP | PLAINTIFF | | OPEN | |